United States Courts
Southern District of Texas
FILED

JUL 2 0 2001

Michael N. Milby, Clerk

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

B-02- 040

| | |
|---|---|
| QUALITY CHEK'D DAIRIES, INC. | § |
| | § |
| VS. | § |
| | § |
| COHYCO, INC. , et al. | § |
| | § |

CIVIL ACTION NO. H-00-0943

**PLAINTIFF'S ANSWER TO**
**DEFENDANTS COHYCO, INC.'S  AND H. LEE RICHARDS'**
**REPLY TO PLAINTIFF'S RESPONSE TO**
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Quality Chekd Dairies, Inc. ("Quality Chekd") answers  Defendants Cohyco, Inc.'s

("Cohyco") and H. Lee Richards' ("Richards") Reply to Plaintiff's Response to Defendants' Motion

for Summary Judgment, as follows:

**I.**
**Introduction**

1.     The thrust of the Defendants' response to Plaintiff's Answer to its Motion for

Summary Judgment is to attempt to characterize the Plaintiff's entire case as a claim for damages

based on conspiracy. Defendants fail to address the fraud and breach of fiduciary claims. Defendants

attempt to defeat the conspiracy claim by the "intercorporate conspiracy defense."  This Answer

accomplishes three things: it points out that Plaintiffs have three causes of action, only one of which

Defendants address; it establishes the fallacy of Defendants' "intercorporate conspiracy defense" to

Plaintiff's conspiracy claim; it provides the Court with Defendant Lee Richards' deposition testimony

1



taken while the summary judgment motion has been pending. This testimony shows conclusively the breach of fiduciary duty by Richards; the fraud by Richards; and the fraud by Cohyco. These two causes of action stand independently of the conspiracy action. Defendants do not address the non-conspiracy causes of action set out in Plaintiff's initial response to Cohyco's motion for summary judgment. However, to clarify the issues of material fact and to give the Court the benefit of the evidence developed in Lee Richards' deposition, taken in this case since the Defendants' response to the Plaintiff's reply to its motion, Quality Chekd submits the following analysis and support of its causes of action. [1]

## II.
## Plaintiff's Causes of Action

2.      The Amended Complaint clearly alleges three distinct causes of action and the summary judgment evidence reflects issues of material fact as to each cause of action.

### The Summary Judgment Evidence

3.      At all times material to this civil action, Cohyco was the 100% owner of F Street Investments Inc., formerly Hygeia Diary Company ("Hygeia") and Carancahua. Richards was the Chairman of the Board of Directors of both Cohyco and Hygeia. He was also a member of the Board of Directors of Quality Chekd until December, 1999. Lee Richards was the actual and functional top executive officer of Cohyco and F Street. Richards, his sister, Merry K. Richards and Doug Purl, Merry K. Richards' son, and their families owned over 70% of Cohyco. (L.R.D. pp. 38, 87-89; 118-119)

---

[1]      Excerpts from Mr. Richards' deposition are authenticated by the affidavit of William L. Bowers and are referenced as "LRD _____." References to other tabs in the William L. Bowers affidavit are referred to as "William L. Bowers Affidavit, Tab _____." References to the original summary judgment evidence will be made by "William L. Bowers Original Affidavit, Tab_____."

4.       Hygeia had been losing money at least since 1995. The audited financial statements for Hygeia's fiscal year ending September 30, 1999 reflected a negative net worth, a loss of over $4 million for the year and were subject to a going concern qualification from the auditors, Deloitte & Touche. (L.R.D. 218-219, WLB Original Affidavit Tabs 1 and 3).

5.       In 1997, Cohyco guaranteed Hygeia's debt to Congress Financial Services ("Congress"). The debt was slightly over $7,300,000 as of November 30, 1999. Cohyco had subordinated its liens on all of Hygeia's real estate to Congress. In January, 1999, Richards had personally borrowed $400,000 to put into Hygeia to ward off creditors. He owed a balance of about $300,000 when Hygeia sold its assets on November 30, 1999. (L.R.D. 49-50; 136, 219).

6.       Richards had been trying to sell Hygeia since 1993. The best offer he had gotten from 1993 to 1998 was $9 million. The final sales price to Southern Foods in 1999 was $9.525 million. This included $3.5 million for Hygeia inventory. If Hygeia had gone out of business in mid-1999, its assets could not have been sold for as much as it actually got. If the sales price had been less than $7.5 million, Cohyco would have had to make up any difference and there would not have been funds to pay off Richards' $300,000 debt. (L.R.D. 95-102; 107-108; 131-133).

7.       Beginning in April and May of 1999, Hygeia began to fall behind in the payment of its accounts, including Quality Chekd's. (L.R.D. 109-110) Richards was trying to sell Hygeia's assets for enough to pay Congress and his bank debt. To do this, he had to keep Hygeia operating and the inventory levels as high as possible. In order to do this, he ran up his account payable balance with Quality Chekd from six or seven hundred thousand to as much as $2.2 million in September, 1999. When the bankruptcy was filed, the balance was $1.6 million. (L.R.D. 107-111). This was a deliberate policy on Richards' part. Since he was also its top executive, Cohyco was fully aware of

3

what Richards was doing to keep Hygeia afloat. As the sole shareholder of Hygeia, Cohyco had to

approve the sale of Hygeia's assets. This entailed the power to approve the price, terms and all details

of the sale. As a practical matter, since Richards was conducting the negotiations, Cohyco's input

into this process was virtually automatic.

8.      The $9.5 million sales price was not enough to pay the $7.3 million Congress debt,

the Richards $300,000 loan, the $16.755 million that Cohyco claimed Hygeia owed it, and the

unsecured creditors $5.1 million trade debt. In summary, based on the schedules filed in the F Street

Bankruptcy and the testimony to date, Hygeia owed at least the following on November 30, 1999.

| | |
|---|---|
| Cohyco | $16,855,000 [2] |
| Richards Bank Loan | $    300,000 |
| Congress Financial Corp. | $ 7,500,000 |
| Unsecured Creditors | $ 5,100,000 |
| Total | $29,755,000 |

9.      Richards testified that Hygeia's receivables were worth about $6.5 million on

November 30, 1999 (L.R.D 31)  When Hygeia's real estate was foreclosed, $1,900,000 was credited

against the Hygeia "debt.".  If these numbers are added to the $9.5 million sales price, the $16 million

total is still $11 million short of the total debt.

10.     After the asset sale, Cohyco foreclosed the five tracts of Hygeia's land and credited

$1.9 million against its debt.  It also filed a financing statement with the Secretary of State covering

all of Hygeia's personal property and initially claimed all of the assets of Hygeia.

The Bankruptcy Schedules reflected that between the sale of Hygeia's assets and the

---

[2]      The original schedules filed in the bankruptcy proceeding reflected a debt due to Cohyco of $14,855,000 and
that before the filing, $1.9 million has been credited against the Hygeia-Cohyco "debt" through Cohyco's foreclosure; Richards
testified in that the payoff to Congress Financial Services was about $7.3 million and the original bankruptcy schedules reflected
approximately $5.1 million in unsecured trade debt. (WLB Affidavit, Tabs 2 and 3)

4

bankruptcy filing, the $6.5 million in receivables Lee Richards testified to dwindled to $1,069,726, of which about $188,556 were worthless retail accounts. Later, Cohyco abandoned its claim to be a secured creditor as to the personal property and filed an amended claim as an unsecured creditor for about $12.5 million, which is slightly over 70% of the unsecured debt. (L.R.D. 158-160)

## Causes of Action

## Breach of Fiduciary Duty

11.    Richards' Liability: As a matter of law, Richards was a fiduciary to Quality Chekd until December, 1999. *International Banker's Life Insurance Company v. Holloway*, 368 S.W.2d 567, 576-78 (Tex. 1963); *Herlder Farms - El Paso v. Herlder*, 519 S.W.2d 473, 476 (Tex. App. – El Paso 1975). As such, he had a duty to disclose all material facts to his principals in connection with any transaction in which he engaged with the principal. Further, he has an obligation to act only in the principal's best interest. *Hule v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996); *Kinzbach v. Corbett-Wallace Corporation*, 160 S.W.2d 509 (Tex. 1942); and *Chien v. Chen*, 759 F.2d 484, 494 (Tex. App. -- Austin 1998). Richards caused Hygeia to run up its accounts with Quality Chekd, but never disclosed Hygeia's insolvent financial condition, the going concern qualification in the September 30, 1998 financials, the defaults under the Congress loan agreement, nor that the only offers or indications of a price ever received for Hygeia's assets from a prospective buyer was insufficient to pay all Hygeia's debts. Further, he did not disclose that Cohyco had positioned itself to claim all of the proceeds and assets over those used to retire the secured debt, to the exclusion of the unsecured creditors. In short, although he either knew or should have known Hygeia could not pay for what it bought through Quality Chekd, Richards neither revealed this fact nor the adverse financial information which he had, that Quality Chekd could have used to decide whether to continue

5

to extend credit to Hygeia.  Even assuming good faith on Richards' part, he still can be found to have

breached his fiduciary duty because such a breach can be committed by negligence as well as by

deliberate acts.  *Brownsville-Valley Regional Medical Center, Inc. v. Gomez*, 894 S.W.2d 753, 756

(Tex. 1995); and *Jewett v. Capital National Bank*, 618 S.W.2d 109, 112 (Tex. App. – Waco [10th]

1981).

12.     Richards' testimony is clear that he was riding his creditors to keep Hygeia alive until

its assets could be sold.  For example, in Mr. Richards' testimony at LRD 112-114, he testified, in

effect, that he was obtaining credit from the vendors so that Hygeia would have products to sell.  As

to Quality Chekd, this is a clear violation of his fiduciary duty as a director to make a full disclosure

of all material facts to his principal and to act only in its best interest.  His position that he was acting

for the benefit of the "trade creditors" lacks any credibility because of the fact that Cohyco either

stood to take all of the unpledged assets or, if it could not support its claim as a secured creditor, as

much as 70% of the remaining assets as an unsecured creditor.

13.     <u>Cohyco's Liability:</u>  In view of the identity of the management, Cohyco was fully

aware of everything Richards was doing to keep Hygeia afloat.  This included the non-disclosure of

critical financial information about Hygeia, the prospective sale and insufficient price for its assets,

and acting contrary to Quality Chekd's interests by running up Hygeia's account balance when

Hygeia could not pay the debt in full.

14.     The Texas law is well established that anyone who causes, participates in or aids or

abets a fiduciary's breach of a duty to their principal is liable for the damages that the breach causes.[3]

_____

[3]     *Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation, et al.,* 160 S.W.2d 509 (Tex. 1942);
*Anton v. Merrill Lynch,* 36 S.W.3d 251 (Tex. App. -- Austin [3rd] 2001); *Socorro v. Quintana,* 993 S.W.2d 201

15.    This is an independent cause of action against the third party and not some phase of a conspiracy claim. *David B. Hendrichs, Trustee v. Thornton*, 973 S.W.2d 348, 371.

16.    The summary judgment evidence establishes Cohyco's financial interest in keeping Hygeia alive and managing the sale. By law, Cohyco had to approve the asset sale. Tex. Bus. corp Act § 5.10.  If the sale price of Hygeia's assets fell below $7.3 million, Cohyco was liable for any balance due on the Congress Financial Services debt and would, at the least, have lost the real estate to a Congress foreclosure.  The management of Hygeia and Cohyco was identical.  This evidence raises issues of material fact outside of any conspiracy theory on the question of Cohyco's liability. This is both direct and circumstantial evidence of Cohyco's knowledge, participation in and aiding and abetting Richards' misconduct. The cases recognize that fraud and breach of fiduciary duty are not openly advertised and can most often be proven by circumstantial evidence. *Bransom v. Standard Hardware*, 874 S.W.2d 919 (Tex. App. – Ft. Worth [2d] 1994).

17.    Defendants' position that the *respondeat superior* doctrine is inapplicable or improperly plead is incorrect.  Paragraph 32 of the Amended Complaint, on page 14 (see Tab B, Defendants' Motion for Summary Judgment), clearly states "Cohyco and Richards are both liable for the damages claim under this cause of action because Richards' wrongful conduct was committed in the course and scope of his employment with Hygeia and Cohyco, and was done on Cohyco and Hygeia's behalf. . ." That same language is found in Paragraph 35 of the Complaint which is part of

---

(Tex. App. -- Corpus Christi, 1999); *Brewer & Prichard, P.C. v. Johnson*, 7 S.W.3d 862, 866 (Tex. App. -- Houston [1st]1999); *David B. Hendricks, Trustee v. Grant Thornton*, 973 S.W.2d 348, 371 (Tex. App. – Beaumont [9th] 1998); and *Kline v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App. – Houston [14th] 1994), writ denied; *Earl Steven Wilson, Trustee, et al. v. Cinemark Corporation*, 858 S.W.2d 645 (Tex. App. -- Fort Worth 1993); and *Hogan v. Cruce*, 688 S.W.2d 161 (Tex. App. -- Dallas [5th] 1985).

the second cause of action for fraud. The facts alleged are borne out by the summary judgment evidence.

18.    The summary judgment evidence reflects that Richards was the principal officer and decision maker of both companies, that he was acting to get the best possible price for the Hygeia assets, and that Cohyco would certainly benefit from every penny he could squeeze out of the sale of Hygeia's assets (LRD 107). Further, as the chief executive employee of the sole owner of Hygeia, Richards' duties as an officer and director of Cohyco, had to include either acting as an officer and a director of the subsidiary or overseeing Hygeia's operations. The summary judgment evidence shows that he did both. (Affidavit of William L. Bowers, Jr., Tabs 1-6.) There are abundant material factual issues in this area and summary judgment should be denied.

## Common Law Fraud

19.    Richards' Liability: As a matter of law, Richards was a fiduciary of Quality Chekd, with a duty of full disclosure Id,§11.    Fraud may be committed either by affirmative misrepresentations or by non-disclosure of material facts where there is a duty to speak. A duty to disclose material facts arises when the defendant occupies a position of trust and confidence, such as that of a fiduciary [4] who engages in a transaction with the principal. The summary judgment evidence shows that Richards knew how bad, even desperate, Hygeia's financial condition was and that he did not disclose this to Quality Chekd's management during the course of the transactions between Quality Chekd and Hygeia. It also shows that the sales negotiations Richards was conducting never

---

[4]    *Bradford v. Vento*, ___S.W.2d___, 44 Tex. Sup. J. 655 (2001); *Schlumberger Technology Corporation v. Swanson*, 959 S.W.2d 171, 180 (Tex. 1997); *Smith Kline Beecham Corporation v. Doe*, 903 S.W.2d 347, 352 (Tex. 1995); *Spoljaric v. Percivil Tours*, 708 S.W.2d 432, 435 (Tex. 1986); *Anderson Greenwood & Co. v. Martin*, ___S.W.2d___, No. 14-98-D1274-CV (Tex. App. – Houston [14th] 2001); and *Hoggett v. Brown*, 971 S.W.2d 472 (Tex. App. – Houston [14th] 1997).

reached a price level that would have paid its trade accounts, especially in view of Cohyco's superior claim to any residual assets and the size of its claim. The evidence also shows Richards' control over which accounts were paid and which were not (LRD 118). This evidence raises a clear fact issue of Richards' liability for fraud.

20. <u>Cohyco's Liability:</u> As in the case of a breach of fiduciary duty, anyone who causes, participates in or aids and abets fraud is liable for the damage the fraud causes. *Crisp v. Southwest Bancshares*, 586 S.W.2d 610, 615 (Tex. App. -- Amarillo [7th] 1979). A cause of action based on causing, participating in or aiding and abetting fraud is separate and distinct from other causes of action, including one for conspiracy. *David B. Hendrichs, Trustee*, 973 S.W.2d 371, supra. Further, someone who knowingly accepts benefits from fraud is liable for such damages.[5] These cases clearly establish that if someone accepts the benefits of fraud, they are jointly and severally liable with the person committing the fraud.

21. The summary judgment evidence reflects the following facts that indicate directly or circumstantially that Cohyco participated in, caused, aided and abetted or benefitted from Richards' fraud.

a. <u>Motive:</u> Cohyco had to keep Hygeia alive to save its own financial hide.

b. <u>Opportunity:</u> Cohyco and Hygeia's top management was identical and vested in Richards; the principal subordinate in both companies was Richards' nephew, Doug Purl.

---

[5] *Branson v. Standard Hardware Co., Inc.*, 874 S.W.2d 919 (Tex. App. – Ft. Worth 1994); *First State Bank of Miami v. Fatheree*, 847 S.W.2d 391 (Tex. App. – Amarillo [7th] 1993); *Corpus Christi Area Teacher's Credit Union v. Hernandez*, 814 S.W.2d 195 (Tex. App. – Corpus Christi [4th] 1991); *Hruska v. First State Bank of Deanville*, 727 S.W.2d 732 (Tex. App. – Houston [1st] 1987); *Southwestern Indemnity Co. v. Cimarron Insurance Company*, 334 S.W.2d 831 (Tex. App. – Waco 1960); *Five Star Transfer and Terminal Warehouse Corporations v. Flusche*, 339 S.W.2d 384 (Tex. App. – Texarkana 1960), citing the very early Texas Supreme Court case, *Pierce v. Fort*, 60 Tex. 464 (1883) and the 5th Circuit case of *Brach v. Moen*, 35 475, 482 (5th Cir. 1929).

c.  Knowledge: Richards personally knew what he was doing or not doing and his knowledge was Cohyco's. Cohyco knew Richards was keeping Hygeia alive on the creditors' backs and either tacitly or actually approved of this conduct.

d.  Control: As the sole shareholder, Cohyco had to approve the asset sale and its terms; it could choose the management of Hygeia; and it had the power to change or prevent any course of action, financially or operationally, that Hygeia pursued.

e.  Benefit: The better price Hygeia got for its assets, the more Cohyco benefitted. By keeping Hygeia alive, Cohyco avoided having to pay off all or a major part of the Congress debt and preserved the real estate and other assets that Hygeia did not sell for itself.

f.  Participation: Cohyco put its own Chairman, Richards, in charge of Hygeia and he controlled the course of the sale negotiations, the terms of the sale and the structure of Cohyco's rights to Hygeia's assets. See also the discussion of the application of the Doctrine of Respondeat Superior, Id §17 and 18.

### Conspiracy

22.  The third cause of action Quality Chekd alleges is that Cohyco and Richards conspired to cause it to obtain credit that it was not entitled to. A civil conspiracy is an agreement between two or more parties to accomplish either: 1) a legal end by illegal means; 2) an illegal end by legal means; or 3) an illegal end by illegal means. *Triplex Communications v. Rilex*, 900 S.W.2d 716 (Tex. 1995).

23.  The summary judgment evidence shows, at least circumstantially, that Cohyco and Richards agreed to keep Hygeia afloat by obtaining credit that Hygeia could not have gotten by candid disclosures of its financial condition to Quality Chekd, and that Richards pursued this end.

24.  The defendants seek to defeat this claim by what is known as the intercorporate

10

conspiracy defense. This defense is that a corporation cannot conspire with its officers or directors or its subsidiaries, and is based on the premise that the acts of the corporation's employees and their wholly owned subsidiaries are deemed to be the acts of the corporations themselves[6]. However, if the officer or director is acting at least in part in his own interest, the defense fails under what is referred to as the "personal purposes" exception. *Christopher v. General Computer Systems, Inc.,* 567 S.W.2d 698 (Tex. App. Dallas 1977). More recently, see the unpublished Court of Appeals opinion in *Moore v. Norvark,* No. 14-93-0094-CV (Tex. App. Houston 1995), a copy of which is was attached. That case cited with approval *Dussouy v. Gulf Coast Investment, Corp.* 660 F.2d 594, 603 (5th Cir. 1981) and the more recent Eastern District of Texas case, *Nelson v. Fontenot* 784 F. Supp. 1258, 1261 (E.D. Tex. 1992) which applied the personal purposes conduct exception to the intercorporate conspiracy defense. See also *Benningfield v. City of Houston,* 157 F.3d 369 (5th Cir. 1998), applying the personal purposes exception, reversing a summary judgment in a 42 U.S.C. 1985 case; and *Elliott v. Chilton,* 89 F.3d 260, 264 (5th Cir. 1996), which recognized this exception to the intercorporate conspiracy defense, but did not apply it in view of the evidence reported before the court in that case.

25.     The summary judgment evidence before the court establishes a fact issue as to whether or not Richards was not at least partially acting on his own behalf. See summary judgment evidence reflecting the personal benefit to Richards in his $90,000 a year for a six year payout of his contract not to personally compete, and the evidence reflecting his substantial personal interest in Cohyco. (

---

[6] This defense is only applicable, if at all, to the conspiracy theory of liability. It does not apply to liability based on aiding or abetting, causing or knowingly benefitting from fraud or breach of fiduciary duty, nor does it foreclose derivative liability based on *respondeat superior.*

(William L. Bowers Original Affidavit, Tabs 3 and 4).

### III.
### Specific Responses to Defendant's Answer

26.     The first full paragraph of page five of the Defendants' Response simply misstates the nature of the case. As pointed out in detail in the Amended Complaint and in the Defendants' Initial Answer to the Motion for Summary Judgment, Cohyco and Richards are being sued because their conduct caused Hygeia to incur debt to Quality Chekd that they knew Hygeia was not able to pay.

27.     That Cohyco was not in the dairy business and did not owe the debt personally is not relevant to these proceedings and is not a material fact. What happened, and is shown by the summary judgment evidence, is that Richards, a director of Quality Chekd, with Cohyco's full knowledge and for its benefit, caused a course of conduct by Hygeia which caused loss to the Plaintiff. There is certainly summary judgment evidence to the effect that Richards was acting in the course and scope of his employment.[7] He admits in his own deposition that he was employed by Cohyco (LRD 87-88). The summary judgment evidence reflects that both companies were operated out of the same office with same staff, and that Richards essentially controlled which of Hygeia's creditors were and were not paid (LRD 118). There is abundant evidence to raise a factual issue concerning whether or not Richards was acting in the course and scope of his employment as an officer and director of Cohyco as well as Hygeia. The summary judgment evidence also establishes that Cohyco guaranteed Hygeia's $7.3 million debt to Congress Financial Services Corporation and that it needed to have Hygeia recover every penny it could get from the sale of its assets to pay the

---

[7] In fact, if defendants' arguments for interposing the intercorporate conspiracy defense are correct, they plead themselves into the *respondeat superior* liability. On the other hand, if the defendant Richards was not acting for and on behalf of Cohyco or its subsidiary, then the intercorporate conspiracy defense does not apply.

obligation Cohyco had guaranteed (LRD 131-134). The summary judgment evidence also establishes that Richards owed the Harlingen National Bank $300,000 that he had borrowed and had paid into Hygeia, and that this debt was secured by real estate owned by another of Cohyco's subsidiaries (LRD 49-51). The Texas Business Corporation Act 2.21(a)(2) is not applicable because it was Cohyco's own conduct, through Richards, that has brought it into this lawsuit. That is precisely what Texas Business Corporation Act 2.21 (a)(2) requires: personal conduct by the individual or entity sought to be held liable.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants' Motion for Summary Judgment be at all things DENIED.

Respectfully submitted,

HAMEL, BOWERS & CLARK L.L.P.

Lee Hamel
SBN: 08818000
William L. Bowers, Jr.
SBN: 02740000
1200 Smith, Suite 2900
Houston, Texas 77002
(713) 659-2000
(713) 659-3809 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served by U.S. Mail and/or fax to counsel of record on this the 20th day of July, 2001.

William L. Bowers, Jr.

13

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **QUALITY CHEKD DAIRIES, INC.** | § | |
| | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. H-00-0943** |
| | § | |
| **COHYCO, INC., et al.** | § | |

## AFFIDAVIT OF WILLIAM L. BOWERS, JR.

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

**BEFORE ME,** the undersigned authority, on this day personally appeared **WILLIAM L. BOWERS, JR.** who, after being duly sworn, stated on his oath as follows:

1.     "My name is William L. Bowers, Jr.  I am over 21 years of age,  sound mind, fully competent to make this affidavit, and am personally acquainted with the facts herein stated.  I am an attorney licensed to practice law in the State of Texas. I am an attorney in the above-referenced cause.

2.     "The following documents are attached to and made a part of this Affidavit, identified by Tabs 1 through 3.

"Tab 1 is a true and correct copy of excerpts from the oral deposition of H. Lee Richards taken in connection with the Rule 2004 proceedings in the F Street Bankruptcy Case.

"Tab 2 is a true and correct copy of pages from the Original Schedules filed in the F Street Bankruptcy Case.

"Tab 3 is a true and correct copy of pages from the Amended Schedules filed in the F Street Bankruptcy Case.

Further, affiant sayeth not.

William L. Bowers, Jr.

-1-

SUBSCRIBED AND SWORN TO BEFORE ME on July 20, 2001

Notary Public in and for
the State of Texas

SHARI ROGERS
Notary Public, State of Texas
Commission Expires 10-05-2002

-2-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Affidavit of William L. Bowers, Jr., with exhibits, has been served by U.S. Mail and/or fax to counsel of record on this the 20th day of July, 2001.

Christopher Andrew Lowrance
Royston, Rayzor, Vickery & Williams
606 N. Carancahua, Suite 1700
Corpus Christi, Texas 78476

*Attorneys for Cohyco, Inc. and H. Lee Richards*

William L. Bowers, Jr.

1    01E28686a.bc

2              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
3                     HOUSTON DIVISION

4    QUALITY CHEKD DAIRIES, INC.    *
                                    *
5         Plaintiff,               *
                                    *
6                                   *
     VS.                            * CIVIL ACTION NO.
7                                   * H-00-0943
                                    *
8    COHYCO, INC., and             *
     H. LEE RICHARDS,               *
9                                   *
          Defendants.              *
10

11

12                    ORAL DEPOSITION OF

13                    H. LEE RICHARDS

14                       VOLUME ONE

15

16                      COPY

17

18          THE ORIGINAL OF THIS TRANSCRIPT
            WILL BE IN THE CUSTODY OF:
19
            HAMEL BOWERS & CLARK, L.L.P.
20                 TWO ALLEN CENTER
            1200 SMITH STREET, SUITE 2900
21              HOUSTON, TEXAS 77002
            713-659-2000, FAX: 713-659-3809
22                BAR NO. 08818000

23

24

25

Quality Chekd Dairies, Inc. vs Cohyco, Inc.                                    H. Lee Richards

Page 29

1  or anyone else at Southern or Suiza about their
2  failure to turn over amounts that they'd
3  collected?
19:01:00  4  A.  Yes, sir.
19:01:00  5  Q.  And what's the answer?
19:01:03  6  A.  They say they think we owe them money.
19:01:05  7  Q.  For what reason?
19:01:07  8  A.  They don't say.
19:01:08  9  Q.  They've never said?
19:01:10  10  A.  No.
19:01:10  11  Q.  You have no idea why they say you owe
12  them money?
19:01:15  13  A.  No, sir.
19:01:20  14  Q.  Have they given you a report as your
15  agent in collecting?  When I say "your," I mean
16  Hygeia's agent in collecting these accounts.  Have
17  they given you a report of their total
18  collections?
19:01:34  19  A.  No, sir.  They've transferred the money.
20  And we still have these accounts on our computer.
21  And we could go in and check -- we have checked
22  all the accounts that have not been paid.  And
23  that's how we come up with the 200 something
24  thousand dollars, that we've contacted these
25  people and they say, hey, we've paid them.  And we

Page 30

1  say, fine, send us a cancelled check.  And by
2  gosh, they send us a cancelled check.
19:02:07  3  MR. LOWRANCE:  Lee, I think we
4  have --
5  (Discussion off the record.)
19:02:58  6  Q.  (BY MR. HAMEL)  The accounts
7  receivable, what is your opinion of the true value
8  on the date of sale on the accounts receivable?
19:03:10  9  MR. LOWRANCE:  I'm sorry, did you
10  say on the date of sale?
19:03:13  11  MR. HAMEL:  On the date of sale,
12  November 30th.
19:03:20  13  MR. LOWRANCE:  I'll object to the
14  form of the question as being vague.  Do you mean
15  what his -- what the true value was when he was
16  sitting there on November 30th or the true value
17  as I sit here today in hindsight of what they were
18  worth on November 30th.
19:03:38  19  MR. HAMEL:  Well, either one.
20  Let's ask them both.
19:03:42  21  A.  What if I could tell you what I estimate
22  it would be today?
19:03:47  23  Q.  (BY MR. HAMEL)  Well, first tell me,
24  when you sold the assets you did to Southern
25  effective November 30th, that day, what did you

Page 31

1  guess that the collections would be on the
2  accounts receivable that were on the books?
19:04:10  3  A.  I'm not sure whether there was any
4  Mexico business in that 8 million, offhand.  And
5  if there is, it would probably knock it down to
6  six and a half.  So let's say six and a half.
19:04:32  7  Q.  Today, what is the value, in your
8  opinion, of those accounts receivable as of
9  November 30th, 1999?
19:04:53  10  A.  I can't tell you that.  I can tell you
11  this.  I can tell you how much cash we have.
19:05:00  12  Q.  You don't have an opinion?
19:05:03  13  A.  I don't have that information, no.
19:05:05  14  Q.  Okay.  Now, was there an aging done on
15  these accounts receivable as of November 30th?
19:05:17  16  A.  Of?
19:05:18  17  Q.  The accounts receivable that were on the
18  books.
19:05:25  19  A.  I don't recall -- I think the only thing
20  I had was a verbal communication on the accounts
21  receivable.  And what had happened is on -- in the
22  last week of October, we made a conversion to get
23  ready for -- what do they call it?
19:05:48  24  MR. LOWRANCE:  Y2K?
19:05:50  25  A.  Y2K.  And the -- in effect, the company

Page 32

1  that was doing the programming of the software,
2  they found out on November 30th that we sold the
3  business.  And they practically abandoned us
4  because they knew that Southern Foods was going to
5  discontinue the program and go to their own
6  system.  And we paid them $78,000 so that they
7  would continue to service the system until
8  Southern Foods could make the conversion.  And to
9  this date, we don't have a financial statement for
10  October and November.
19:06:56  11  Q.  Do you have an opinion -- and I think
12  you have said no.  Do you have an opinion of what
13  the true value of the receivables were as of
14  November 30th, 1999 based upon the events that
15  have occurred since November 30th, 1999 to date?
19:07:14  16  MR. LOWRANCE:  Objection, asked and
17  answered.
19:07:18  18  Q.  (BY MR. HAMEL)  You have no opinion?
19:07:19  19  A.  I already gave you a number.
19:07:26  20  Q.  Is that your opinion of what they were
21  worth -- they are worth today?
19:07:32  22  A.  I don't know what they're worth today.
19:07:36  23  Q.  Do you know of any information that
24  would indicate that Southern has failed to
25  exercise reasonable diligence in collecting as

8 (Pages 29 to 32)

Quality Chekd Dairies, Inc. vs Cohyco, Inc.                                      H. Lee Richards

Page 37

1  executive officer of that company how much of the
2  debt on the books as accounts receivable was
3  current on the date of sale?
19:12:42  4      A.  No, sir.
19:12:42  5      Q.  You have no idea?
19:12:43  6      A.  No, sir.
19:12:44  7      Q.  Did you ever know?
19:12:45  8      A.  Oh, yes, sir.  I looked at the accounts
9  receivable frequently.
19:12:51  10      Q.  So, whether Southern collected it or you
11  collected it after the sale, how much has been
12  collected on the accounts receivable?
19:13:00  13      A.  I don't know.
19:13:00  14      Q.  You have no idea?
19:13:02  15      A.  No, sir.
19:13:03  16      Q.  Are we at 3 million or 2 million or
17  1 million?  Do you have any idea?
19:13:07  18      A.  Offhand, I looked at a number.  And I
19  just can't recall.  I'm not active in that part of
20  the business right now.
19:13:17  21      Q.  Well, Hygeia is now F Street, right?
19:13:22  22      A.  Yes, sir.
19:13:24  23      Q.  And it's still operating in the sense
24  that it hasn't shut down.  It's still keeping its
25  books, isn't it?

Page 38

19:13:31  1      A.  Yes.
19:13:32  2      Q.  And you even have access to those books
3  and records, don't you?
19:13:37  4      A.  More or less.
19:13:37  5      Q.  You and your family own over 70 percent
6  of Cohyco, don't you?
19:13:43  7      A.  Yes, sir.
19:13:43  8      Q.  And Cohyco owns Hygeia, doesn't it?
19:13:46  9      A.  Yes, sir.
19:13:47  10      Q.  And so the financial stability of its
11  subsidiary, Hygeia, was important to you and your
12  family and Cohyco shareholders?
19:13:56  13      A.  Yes, sir.
19:13:56  14      Q.  All right.  So are you telling us that
15  you don't know how much has been collected on the
16  accounts receivable that was an asset of Hygeia
17  and not sold to Southern?  You have no idea how
18  much --
19:14:07  19      A.  I don't know how much has been
20  collected.
19:14:09  21      Q.  You have no idea?
19:14:10  22          MR. LOWRANCE:  Objection, form.
23  Asked and answered.  You're badgering the witness.
19:14:10  24      A.  I do not know.
19:14:12  25      Q.  (BY MR. HAMEL)  Within a range, do you

Page 39

1  know whether it's more or less than half?
19:14:19  2      A.  It's a great amount, a large percentage,
3  I would say.
19:14:24  4      Q.  Well, is it more or less than half?
19:14:27  5      A.  A lot more than half.
19:14:29  6      Q.  Do you have the records that show the
7  collections --
19:14:31  8      A.  Yes, sir.
19:14:31  9      Q.  -- to the account on a consistent basis
10  each month from November 30th of 1999 to date?
19:14:44  11      A.  I don't think I can answer that.  I
12  don't know.
19:14:48  13      Q.  You don't know?
19:14:49  14      A.  I think Doug Purl has the records, yes.
19:14:52  15      Q.  Do you know of any reason why Hygeia
16  wouldn't keep its books from month to month after
17  November 30th, 1999?
19:14:59  18          MR. LOWRANCE:  I'm going to object
19  to the form of that question.  Are you talking
20  about F Street or Hygeia?
19:15:05  21          MR. HAMEL:  We have an agreement,
22  Mr. Richards, that when I say Hygeia, I'm talking
23  about --
19:15:08  24      A.  I understand that.
19:15:09  25      Q.  -- Hygeia or Hygeia later known as F

Page 40

1  Street.  Okay?
19:15:15  2      A.  Okay.
19:15:18  3      Q.  Can you tell me if Hygeia stopped
4  keeping its books?
19:15:22  5      A.  No, sir.  It's got the records that
6  would show everything, yes, sir.
19:15:23  7      Q.  It's got the records.  All right.  So if
8  you wanted to know at the end of each month after
9  November 30th of 1999 what the status of the
10  accounts receivable collections was, you would be
11  able to find that out, wouldn't you?
19:15:41  12      A.  Yes, sir.
19:15:41  13      Q.  Okay.  And so if I make that request,
14  are you willing to cause Hygeia to furnish those
15  documents to me?
19:15:47  16      A.  Yes, sir.
19:15:48  17      Q.  All right.  Would you agree that
18  whatever the collections are on those accounts
19  receivable that that's the best test of what the
20  accounts receivable were worth on November the
21  30th of 1999?
19:16:03  22      A.  Yes, sir.
19:16:09  23      Q.  Now, sometime in January I think you
24  said because the board of directors of -- who was
25  it?  Cohyco or Hygeia?

Quality Chekd Dairies, Inc. vs Cohyco, Inc.                                    H. Lee Richards

Page 49

19:33:13 1    Q. Did you consider that the debt of Hygeia
2    to Cohyco was a real debt?
19:33:22 3    A. Yes, sir.
19:33:27 4    Q. Did you consider it to be a real debt in
5    1998, 1999?
19:33:34 6    A. I considered it in every year since we
7    made it, 1995.
19:33:40 8    Q. To be real debt. Okay. And on November
9    the 30th of 1999, what was the debt, in round
10    figures, of Hygeia to Cohyco?
19:33:52 11    A. Let's see. The secured debt was around
12    one million four something, including interest.
19:34:07 13    Q. But for failure to file the UCC filings,
14    what was the debt? Didn't Cohyco -- didn't Hygeia
15    owe Cohyco more money than 1.4 million on
16    November 30th, 1999? Did you say 14 million?
19:34:27 17    A. I said 14 million.
19:34:32 18    Q. Thank you. That was the secured debt,
19    right?
19:34:35 20    A. Yes.
19:34:37 21    Q. Okay. That's the debt that Hygeia owed
22    Cohyco?
19:34:42 23    A. Yes.
19:34:43 24    Q. On November the 30th of 1999?
19:34:48 25    A. Yes, sir.

Page 50

19:34:50 1    Q. On that date, approximately how much was
2    owed to all your banks and other lenders like
3    that?
19:35:01 4    A. 7.3 million was owed to Congress.
19:35:08 5    Q. Okay. I'm not going to keep you here
6    until 8:00. I know you've got to drive down
7    there. That's a late time to start off. But I do
8    want to ask you a series of quick questions there?
19:35:26 9    A. Go right ahead. I'll be here to 8:30 if
10    you like.
19:35:29 11    Q. Whatever suits you. During 1999, there
12    was a debt at Congress Financial, right --
19:35:46 13    A. Yes, sir.
19:35:46 14    Q. -- that Hygeia owned Congress? And I
15    think you said it was approximately 7.3; is that
16    correct?
19:35:53 17    A. Really it was six.
19:35:54 18    Q. Six? Okay.
19:35:55 19    A. We had a loan for 8 million, and they
20    had a $1 million reserve set up for producer
21    payroll, because a producer -- milk producers have
22    first lien against your accounts receivable. And
23    then they had another million reserved in case --
24    until we made a profit. And the reason it went up
25    to 7.3 is I went to them and I said, look, I want

Page 51

1    to pay our creditors as much as I can between now
2    and the sale. And I said, you know, I'd
3    appreciate extending additional credit. And I
4    didn't even ask them how much. And I didn't know
5    how much it was until the date we closed.
6    But what I was trying to do is, we had
7    creditors that demanded cash on delivery. We had
8    creditors that extended us credit beyond 30 days.
9    And I was trying to get everybody up to an even
10    point and also trying to pay them as much as I
11    could in advance so that they would have the
12    benefit of that situation.
19:37:18 13    Q. Okay. So in any event, did you borrow
14    the 300 yourself?
19:37:24 15    A. Three hundred?
19:37:25 16    Q. Thousand.
19:37:25 17    A. Which 300,000? Are we talking about the
18    7.3 million?
19:37:31 19    Q. You said you went back to them and
20    borrowed an additional 300,000.
19:37:36 21    A. No, no, no. I'm talking about -- you
22    misunderstood. Maybe I --
19:37:39 23    Q. Okay. Try it again.
19:37:41 24    A. I went to Congress and asked them to
25    extend additional credit --

Page 52

19:37:48 1    Q. On the line?
19:37:49 2    A. On the line so I could pay my creditors.
19:37:52 3    Q. So they advanced in spite of the
4    reserves, is what you're telling me?
19:37:56 5    A. That's right.
19:37:57 6    Q. Okay. Now, as of September 30th of
7    1998, that's the end of your fiscal year?
19:38:09 8    A. Yes, sir.
19:38:11 9    Q. All right. And your long-time outside
10    accountants -- Deloitte & Touche, right -- they
11    did an audited financial statement for that
12    year-end?
19:38:22 13    A. Yes, sir.
19:38:24 14    Q. And it came out when? Approximately
15    November, December?
19:38:32 16    A. Really probably January or February.
19:38:35 17    Q. Whenever it's dated.
19:38:35 18    A. Yes.
19:38:35 19    Q. It's dated earlier?
19:38:36 20    A. I read a letter that it's dated
21    December 8th. But that's ridiculous. We would
22    seldom get a balance sheet and income statement
23    before our board meeting. And we'd set our board
24    meeting in December based on when they thought
25    they could get the statement done. And normally

13 (Pages 49 to 52)

1   01E28763a.bc

2          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
3                  HOUSTON DIVISION

4   QUALITY CHEKD DAIRIES, INC.    *
                                   *
5        Plaintiff,                *
                                   *
6                                  *
    VS.                            *  CIVIL ACTION NO.
7                                  *  H-00-0943
                                   *
8   COHYCO, INC., and             *
    H. LEE RICHARDS,               *
9                                  *
         Defendants.               *
10

11

12              ORAL DEPOSITION OF

13                H. LEE RICHARDS

14                  VOLUME TWO

15                   COPY

16

17

18        THE ORIGINAL OF THIS TRANSCRIPT
           WILL BE IN THE CUSTODY OF:
19
           HAMEL BOWERS & CLARK, L.L.P.
20               TWO ALLEN CENTER
          1200 SMITH STREET, SUITE 2900
21             HOUSTON, TEXAS 77002
          713-659-2000, FAX: 713-659-3809
22             BAR NO. 08818000

23

24

25

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                                    H. LEE RICHARDS

|  | Page 87 |
|---|---|
| | PROCEEDINGS |
| 1 | PROCEEDINGS |
| 2 | H. LEE RICHARDS, |
| 3 | having been first duly sworn, testified as |
| 4 | follows: |
| 5 | EXAMINATION |
| 09:11:14 6 | Q. (BY MR. HAMEL) Mr. Richards, you |
| 7 | began working with Hygeia in 1956? |
| 09:11:20 8 | A. Yes. |
| 09:11:21 9 | Q. And it was a family-founded business? |
| 09:11:24 10 | A. Yes, sir. |
| 09:11:25 11 | Q. So your father had started it before |
| 12 | you? |
| 09:11:29 13 | A. Yes, sir. |
| 09:11:32 14 | Q. And then when did you take over Hygeia |
| 15 | as the president and chairman? |
| 09:11:46 16 | A. As president, it was 1969, I believe, |
| 17 | somewhere around that period. |
| 09:11:51 18 | Q. You served from 1969 to 1985? |
| 09:12:00 19 | A. It's close. I don't recall exactly. |
| 09:12:03 20 | Q. All right. And from the time you ceased |
| 21 | serving as president, you served exclusively as |
| 22 | chairman of the board of Hygeia? |
| 09:12:12 23 | A. Yes, sir. |
| 09:12:13 24 | Q. So that would be from approximately 1985 |
| 25 | through today -- |

|  | Page 89 |
|---|---|
| 1 | you were president and/or chairman of Hygeia, you |
| 2 | belonged to -- did you belong to other -- did you |
| 3 | belong to nonprofit corporations where you |
| 4 | volunteered your time or efforts? |
| 09:13:55 5 | A. I belonged to Quality Chekd or the |
| 6 | company did. I represented the company with |
| 7 | Quality Chekd. I was on the board of directors of |
| 8 | the Milk Industry Foundation. I was on the board |
| 9 | of directors of the National Independent Dairy |
| 10 | Association. |
| 09:14:16 11 | Q. What was the first? |
| 09:14:17 12 | A. And president at one time. |
| 09:14:18 13 | Q. What was the foundation called? |
| 09:14:22 14 | A. Milk Industry Foundation. It's an |
| 15 | association much like, you know, any industry |
| 16 | association. |
| 09:14:34 17 | Q. All right. Milk Industry Foundation? |
| 18 | Is that what you're saying? |
| 09:14:40 19 | A. Yes, sir. |
| 09:14:40 20 | Q. Okay. And then you were on the board of |
| 21 | the National Independent Dairy Association? |
| 09:14:49 22 | A. Yes. And I was president at one time. |
| 09:14:53 23 | Q. All right. |
| 09:14:57 24 | A. Also, I was president and active in the |
| 25 | Dairy Products Institute of Texas. |

|  | Page 88 |
|---|---|
| 09:12:18 1 | A. Yes, sir. |
| 09:12:19 2 | Q. -- you have been chairman of the board |
| 3 | of Hygeia? |
| 09:12:23 4 | A. Yes. |
| 09:12:25 5 | Q. When did Cohyco get formed? |
| 09:12:30 6 | A. I believe that was '76. |
| 09:12:33 7 | Q. And when it was formed, did it become |
| 8 | the parent of Hygeia Dairies? |
| 09:12:38 9 | A. Yes, sir. |
| 09:12:39 10 | Q. And when it was formed, were you |
| 11 | president and chairman of the board? |
| 09:12:46 12 | A. Of? |
| 09:12:47 13 | Q. Cohyco. |
| 09:12:49 14 | A. No, sir. |
| 09:12:50 15 | Q. When did you become president and when |
| 16 | did you become chairman of the board of Cohyco? |
| 09:12:56 17 | A. I really don't recall. It may have been |
| 18 | president, but I don't know the exact date. And I |
| 19 | wasn't chairman initially. |
| 09:13:08 20 | Q. Were you chairman of Cohyco in 1995 on? |
| 09:13:12 21 | A. Yes, sir. |
| 09:13:14 22 | Q. All right. And that's to this very |
| 23 | date? |
| 09:13:17 24 | A. Yes, sir. |
| 09:13:18 25 | Q. All right. Now, during the years that |

|  | Page 90 |
|---|---|
| 09:15:02 1 | Q. All right. What about church or a |
| 2 | country club? Have you ever served on a board of |
| 3 | directors of any of those kinds of organizations? |
| 09:15:11 4 | A. Many years ago I was on the vestry of |
| 5 | St. Albans Episcopal Church, but never on a |
| 6 | country club. |
| 09:15:18 7 | Q. That's in the Western Diocese of Texas? |
| 09:15:21 8 | A. Yes. It's part of the Western Diocese. |
| 9 | Let's see. I was -- I've been active in a lot of |
| 10 | charitable functions. |
| 09:15:33 11 | Q. Have you served on -- |
| 09:15:34 12 | A. Chambers and -- |
| 09:15:35 13 | Q. Have you served as director of the |
| 14 | Chamber, for example? |
| 09:15:40 15 | A. At one time I was director of the |
| 16 | Chamber. I've never served as an officer of the |
| 17 | Chamber. |
| 09:15:44 18 | Q. You're talking about Harlingen Chamber |
| 19 | of Commerce? |
| 09:15:51 20 | A. Harlingen Chamber of Commerce. I was |
| 21 | director of the Harlingen National Bank, |
| 22 | shareholder there. I was a director of Central |
| 23 | Power & Light Company. |
| 09:15:56 24 | Q. Down in Harlingen? |
| 09:15:58 25 | A. Yes. Well, actually, it was |

2 (Pages 87 to 90)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                    H. LEE RICHARDS·

Page 95

09:21:46  1      A.  Probably mid to late -- well, let me put
         2   it this way: Over the years, this was not the
         3   first time I talked to Southern.
09:21:57  4      Q.  All right.  Let me clarify my question.
09:21:58  5      A.  In relation to these negotiations,
         6   probably about mid-October was my first meeting
         7   with Southern.  And they gave me a price of
         8   $9 million.
09:22:13  9      Q.  Okay.  For the assets that they wanted?
09:22:21 10      A.  At that time, I don't think the assets
        11   they wanted or didn't want were not accurately
        12   defined.  That was -- and I assume that they were
        13   talking about all the physical assets of Hygeia.
09:22:34 14      Q.  Okay.
09:22:35 15      A.  And I assume they thought they were
        16   talking about the same thing.
09:22:40 17      Q.  Well, they didn't buy all the physical
        18   assets of Hygeia, did they?
09:22:45 19      A.  No, sir.
09:22:46 20      Q.  No.  Are you saying that in mid-October
        21   the first time that any price was mentioned for
        22   any assets?
09:22:57 23      A.  In the current negotiation.
09:22:58 24      Q.  During 1999.  There were no other
        25   negotiations with Southern except the negotiations

Page 96

         1   that led to the sale in question during 1999, were
         2   there?
09:23:07  3      A.  I met briefly with Pete Schenkel, I
         4   think in July.  And he offered 9 million.
09:23:13  5      Q.  In July of 19 --
09:23:14  6      A.  '99.
09:23:19  7      Q.  Now, would you agree that people just
         8   don't offer 9 million unless they specify what it
         9   is they're offering it for?
09:23:27 10      A.  Yes, sir.
09:23:28 11      Q.  Okay.
09:23:28 12      A.  We were talking about all the assets.
09:23:31 13      Q.  All the assets?
09:23:32 14      A.  All the physical assets which they --
        15   most of which they eventually acquired.
09:23:54 16      Q.  Did that include the accounts
        17   receivable?
09:23:57 18      A.  No, sir.
09:23:58 19      Q.  All the physical assets, but not
        20   including intangibles and not including cash and
        21   not including accounts receivable?
09:24:06 22      A.  Right.
09:24:09 23      Q.  So that would include Mexico?
09:24:12 24      A.  No, sir.  They didn't want Mexico.  They
        25   never wanted Mexico.

Page 97

09:24:17  1      Q.  You knew that in July of '99, if not
         2   earlier?  '99?
09:24:21  3      A.  I knew what?
09:24:23  4      Q.  That Southern didn't want Mexico.
09:24:25  5      A.  Yes, sir.  Hygeia didn't own any
         6   physical assets in Mexico.
09:24:48  7      Q.  It owned subsidiaries that owned some
         8   assets in Mexico?
09:24:53  9      A.  Yes, sir.
09:25:20 10      Q.  So it was clear to you -- we've now
        11   pushed the date back to July of 1999 where you're
        12   saying that was the first time that any price for
        13   any asset was ever offered by Southern; is that
        14   correct?
09:25:35 15      A.  No, sir, I didn't say that.  I said in
        16   current negotiations.  They made an offer in
        17   November of '94.
09:25:42 18      Q.  All right.  Let's talk about the
        19   content -- you remember you told me that you met
        20   or called Schenkel in January or February of 1999?
        21   You told me that day before yesterday.
09:25:58 22      A.  That may be right.  I don't recall.
09:26:00 23      Q.  All right.  Was that the beginning of
        24   the relationship that led to the sale in -- or the
        25   discussions that led to the sale on November 30th

Page 98

         1   of 1999?
09:26:13  2      A.  Not really, no.
09:26:15  3      Q.  So in your mind it was sort of a
         4   continuum that maybe went back to many prior
         5   contacts in prior years?
09:26:22  6      A.  Yes, more or less.  But I would say the
         7   July call was the initial -- my initial contact
         8   relative to the negotiations that ended on
         9   November 30th.
09:26:36 10      Q.  Well, did you call them or did they call
        11   you?
09:26:39 12      A.  No, sir, I called them.
09:26:42 13      Q.  Mr. Schenkel, is that the person you
        14   called?
09:26:44 15      A.  Yes, sir.
09:26:45 16      Q.  And that was your first call in 1999 to
        17   Mr. Schenkel or anyone that worked for them?
09:26:52 18      A.  As best I recall.
09:26:54 19      Q.  Do you recall giving testimony that you
        20   contacted Southern in January or February of 1999?
        21   Do you recall that testimony?
09:27:03 22      A.  I really don't recall.
09:27:32 23      Q.  When did you -- you mentioned Mr. Oller
        24   and Mr. Parr earlier in your testimony.  When did
        25   you contact them?  In 1999?

4 (Pages 95 to 98)

Page 99

09:27:52  1      A.  Yes, I believe so.  It might have been
2   sometime in '98.  But currently.
09:27:57  3      Q.  All right.  Is it fair to say that you
4   were actively seeking a buyer for Hygeia's assets
5   beginning sometime in late 1998?
09:28:12  6      A.  I really began in 1993.
09:28:17  7      Q.  All right.  And then those efforts ended
8   and you continued operations.  And then you tried
9   it again in '97 or sometime and those efforts
10   ended.  And then you resumed the efforts again to
11   sell the assets of Hygeia sometime in 1998, didn't
12   you?
09:28:39 13      A.  I believe I worked with Deloitte &
14   Touche in '97.  I think those folks were completed
15   in late '97 or early '98.  And I made another
16   effort in '98 to contact people in the industry to
17   see if I could sell the business.
09:28:59 18      Q.  Okay.  Excuse me just a minute.  On that
19   point, who were the people in the industry that in
20   '98 was contacted?
09:29:11 21      A.  Oh Lordy.  I was in contact with
22   Parmalot.  I was in contact with Brookfield.
09:29:26 23      Q.  This is '98?
09:29:34 24      A.  Yes, sir.  I was -- let's see.  Dean
25   Foods.

Page 100

09:29:40  1      Q.  That's Mr. Parr?
09:29:42  2      A.  Yes, sir.  Southern.
09:29:50  3      Q.  In '98?
09:29:52  4      A.  Yes, sir.
09:29:54  5      Q.  Was that Mr. Schenkel?
09:29:56  6      A.  Yes, sir.  All these times run together
7   for me.  I think I might have been in touch with
8   Farm Fresh.
09:30:25  9      Q.  In 1998?
09:30:27 10      A.  Yes, sir.  Probably in contact with Milk
11   Products, LLP, which is the Borden people in
12   Texas.  And that may have been in '99 also.
09:31:16 13      Q.  All right.  After your contact with
14   Mr. Schenkel in 1998, of Southern, did you -- or
15   incident to those contacts, did you offer to sell
16   the assets of Hygeia to Southern?
09:31:33 17      A.  Yes, sir.
09:31:34 18      Q.  And did he respond in 1998?
09:31:37 19      A.  Yes, sir.
09:31:38 20      Q.  What did he say?
09:31:39 21      A.  9 million.
09:31:41 22      Q.  All right.  And did he specify the
23   assets?
09:31:44 24      A.  No, sir.
09:31:45 25      Q.  Did he make that offer based on

Page 101

1   financial information or a package that you put
2   together for him?
09:31:52  3      A.  He had a package put together by
4   Deloitte & Touche.
09:31:54  5      Q.  And you gave him that package and he
6   made a response of 9 million?
09:31:59  7      A.  Yes.
09:32:00  8      Q.  And did he specify whether it was the
9   whole company or an asset that he was interested
10   in?
09:32:06 11      A.  It was basically the assets which he
12   eventually purchased, plus I think three pieces of
13   property that we kept at that time.  It was for
14   all of the operating assets of Hygeia.
09:32:16 15      Q.  Okay.  So basically his position then
16   was the same as the position turned out to be in
17   October of 1999, 9 million, except this time there
18   was no land attached to the offer?
09:32:33 19      A.  No land?
09:32:35 20      Q.  I thought you said that there were three
21   properties in 1998 that were part of the assets
22   that Southern was interested in in 1998 but that
23   those parcels weren't available in 1999.
09:32:47 24      A.  Well, we really never got to that point
25   until about the middle of November of 1999 to

Page 102

1   establish assets.  And I was just negotiating to
2   keep as many assets as I could.
09:33:01  3      Q.  Basically what I heard you say
4   earlier -- correct me if I'm wrong -- that the
5   offer by Mr. Schenkel in '98 was an offer for
6   assets that eventually Southern, in fact,
7   purchased?
09:33:16  8      A.  With the exception of the three
9   properties that they didn't purchase which was
10   negotiated in the middle of November of '99.
09:33:23 11      Q.  Okay.
09:33:24 12      A.  We excluded those at that time.
09:33:28 13      Q.  Okay.
09:33:38 14      A.  And actually, that changed between the
15   middle of November and the end of November.
09:33:49 16      Q.  Well, what I'm interested in is whether
17   or not the assets that were actually purchased by
18   Southern on November the 30th were the same assets
19   that were the subject of this $9 million offer in
20   1998?
09:34:06 21      A.  Excluding those that were made
22   exceptions to, in other words, the three that we
23   kept.  But actually, between about the middle of
24   November and November 30th, they decided that they
25   wanted to keep Brownsville.  And it was not

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                    H. LEE RICHARDS

Page 107

09:39:48 1    A.  I think that -- we were definitely
2    weaker financially.  I don't know if that affected
3    his thinking in any way at all.  He certainly
4    didn't change his offer from his previous offers.
09:40:12 5    Q.  Would you agree with me that in July of
6    1998 if Hygeia had just closed its doors and then
7    tried to sell its assets that it would not have
8    gotten as much for its assets that it did sell?
09:40:27 9        MR. LOWRANCE:  July of 1998?
09:40:29 10        MR. HAMEL:  Did I say July of '98?
09:40:30 11        THE WITNESS:  I'm not sure.  Just
12    say it again.  I didn't get the whole question.
09:40:32 13    Q.  (BY MR. HAMEL)  I'll repeat it.  You
14    went to see Mr. Schenkel again in July of 1999?
09:40:39 15    A.  Yes, sir.
09:40:40 16    Q.  Okay.  Would you agree with me that in
17    July of 1999 if Hygeia had just thrown in the
18    towel and stopped operating and made a decision to
19    liquidate its assets that Southern or any other
20    company would not have paid as much for those
21    assets as Southern paid effective November 30th of
22    1999?
09:41:04 23    A.  Yes, I'm sure of that.
09:41:06 24    Q.  You're sure of that?
09:41:08 25    A.  Yes.

Page 108

09:41:09 1    Q.  Okay.  So it was important to keep
2    Hygeia operating, wasn't it?
09:41:18 3    A.  Yes, sir.
09:41:20 4    Q.  All right.  Now, would you agree with me
5    that the purchases of Hygeia -- let's say
6    purchases from Quality Chek'd -- your purchases
7    were approximately the same for the 12 months
8    ending November 30th of 1999 that they were for
9    the same one month period ending November 30th of
10    1998?
09:42:02 11    A.  Yes, sir.
09:42:03 12    Q.  All right.  And would you also agree
13    with me, however, that the debt during that period
14    increased -- in the later period increased
15    substantially over the average debt in the earlier
16    period?
09:42:23 17    A.  You're saying the debt increased
18    substantially in, say, November 30 of '99?
09:42:31 19    Q.  Right.
09:42:31 20    A.  Compared to November 30 of '98.
09:42:35 21    Q.  Yeah.  And I mean the debt to Quality
22    Chek'd, Hygeia's debt to Quality Chek'd?
09:42:39 23    A.  Yes, sir.
09:42:40 24    Q.  All right.  So basically would you agree
25    with me that the pattern was that Hygeia was

Page 109

1    continuing to do business with Quality Chekd at
2    the same pace in 1999 that it did in 1998?
09:42:56 3    A.  Yes, sir.  And we were doing the same
4    amount of business.
09:43:01 5    Q.  But the difference was that you weren't
6    paying Quality Chekd in 1999, but you were in
7    1998?
09:43:09 8    A.  I think we were -- in '99 we were
9    substantially paying the same amount until April
10    of '99.  That's when we started to fall back.
09:43:19 11    Q.  Okay.  And in April of '99, would you
12    agree with me that when you began to fall back, in
13    other words, not pay your invoices from Quality
14    Chekd timely, that the reason was that -- well,
15    what was the reason?  You said the sales were the
16    same, you're still doing the same amount of
17    business.  You said the purchases from Quality
18    Chekd were the same.  And yet your payment of your
19    debt to Quality Chekd was less.
20        Now, what was the reason for your not
21    directing cash flow from operations to payment of
22    Quality Chekd's debt for the nine months in 1999
23    when the debt began to increase?
09:44:13 24        MR. LOWRANCE:  Objection to the
25    form of the question.

Page 110

09:44:14 1        MR. HAMEL:  That was a complicated
2    question.
09:44:17 3    Q.  (BY MR. HAMEL)  Let me put it another
4    way.  You have agreed that you began -- that
5    Quality Chekd began to change his prior pattern of
6    paying its invoices to Quality Chekd -- Hygeia
7    changed its pattern of paying its invoices to
8    Quality Chekd beginning in April of 1999, right?
09:44:39 9    A.  I think that took place, yes.  But we
10    didn't change it intentionally.
09:44:44 11    Q.  Well, but it changed?
09:44:46 12    A.  We paid what we could.
09:44:49 13    Q.  It changed?
09:44:50 14    A.  Yes, started falling behind.
09:44:52 15    Q.  You started falling behind.  And you
16    started falling behind in April, May, June, July,
17    August, September, October and November of 1999?
09:45:01 18    A.  No, sir, I wouldn't say that.
09:45:03 19        MR. LOWRANCE:  Objection.
09:45:04 20    Q.  (BY MR. HAMEL)  Which month is wrong?
09:45:06 21    A.  We were behind about 1.6 -- not behind.
22    Our total obligation to Quality Chekd, I guess it
23    was June when Mel and I talked, was 1.6 million.
24    And in September, according to their records, it
25    went up to 2.2.  And by December after the sale,

7 (Pages 107 to 110)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                    H. LEE RICHARDS

Page 111

it was back down to 1.6.
09:45:33   Q.   Well, do you know what your balance
was -- Hygeia's balance to Quality Chekd was in
March of 1999?
09:45:48   A.   I really didn't know until I looked it
up recently.
09:45:51   Q.   And you found out it was about what,
500, 600?
09:45:55   A.   I think it was more than that, six,
700,000.
09:46:03   Q.   So in four months, it increased a
million bucks, approximately?
09:46:08   A.   Yeah.
09:46:10   Q.   And would you agree that you took --
09:46:12   A.   Actually, in three months.
09:46:14   Q.   In three months. You took a million
dollars of product in three months but didn't pay
for it during that period of time?
09:46:21   A.   I took much more than a million dollars
worth of property and I did not fully pay.
09:46:27   Q.   So the part that had not been fully paid
for amounted to a million bucks, didn't it?
09:46:33   A.   Pretty close, yeah.
09:46:34   Q.   Yeah. And yet with those purchases that
you made on the credit of Quality Chekd, Hygeia

Page 112

was able to make products and sell them and keep
its cash flow up, wasn't it?
09:46:47   A.   I think if we could have kept our cash
flow up, we wouldn't have fallen behind.
09:46:52   Q.   Well, you wouldn't have bought all that
product from Quality Chekd or Quality Chekd's
suppliers if you didn't turn it into product that
you could sell, would you?
09:47:03   A.   That's right.
09:47:03   Q.   All right. And you did sell it, didn't
you?
09:47:05   A.   Yes.
09:47:05   Q.   All right.
09:47:05   A.   But it didn't increase our cash flow.
It was about the same as it was the year before.
09:47:13   Q.   So why didn't Quality Chekd get paid the
million dollars?
09:47:16   A.   We didn't have the money to pay it.
09:47:19   Q.   Well, why did you keep borrowing from
Quality Chekd if you knew you didn't have the
money to pay?
09:47:22   A.   I wasn't borrowing from Quality Chekd.
09:47:25   Q.   You weren't?
09:47:26   A.   No, sir.
09:47:31   Q.   You don't agree that you were using the

Page 113

credit of Quality Chekd in order to operate
Hygeia?
09:47:37   A.   I was using the credit of everybody,
every vendor.
09:47:43   Q.   Including Quality Chekd?
09:47:45   A.   Including Quality Chekd.
09:47:47   Q.   All right. So you were borrowing from
Quality Chekd as well as the other vendors?
09:47:48   A.   Well, I don't call it borrowing.
09:47:50   Q.   Well, would you agree that that's a fair
characterization?
09:47:53   A.   Well, you know, Quality Chekd has
vendors that they do business from that they get
extended terms. Right? So I was using extended
terms to --
09:48:03   Q.   Would you agree that you were using
Quality Chekd like a bank?
09:48:10   A.   Not any more than any other vendor.
09:48:13   Q.   Okay. But all the other vendors and
you, to the extent that you didn't pay within 21
days, you were using Quality Chekd as a bank?
09:48:25   A.   Just like every other vendor.
09:48:27   Q.   All right. But you would agree with
that statement?
09:48:31   A.   No, sir. I don't view it that way.

Page 114

Sorry.
09:48:35   Q.   Well, would you agree that when you
didn't pay your debt to Quality Chekd that you
were, in effect, borrowing the money from Quality
Chekd?
09:48:44   A.   Not really.
09:48:46   Q.   Not really?
09:48:46   A.   No.
09:48:47   Q.   What were you doing?
09:48:49   A.   You know, I didn't even know I was that
far behind until Mel Rapp sent me the
communication in June. Mel Rapp didn't know we
were behind until June. He was in our plant in
May and said nothing about it. And it slipped up
on me just like it did anything else.
            Now, I did know that our total payables
were going up, but I didn't, you know, look at it
as an individual situation.
09:49:24   Q.   The question was: If your relationship
with Quality Chekd was not a borrower-lender
relationship in effect, what was it? How would
you describe it when you --
09:49:46   A.   It's a vendor-supplier-buyer
relationship.
09:49:50   Q.   And you got something of value from

Page 115

| | 1 | Quality Chekd, and you didn't pay for it timely; |
| 09:49:58 | 2 | isn't that right? |
| | 3 | A. That's right. You know, 1.6 million, I |
| | 4 | couldn't pay for it all. |
| 09:50:02 | 5 | Q. But you kept borrowing. And you ran |
| | 6 | that 1.6 million up to 2.2 million, didn't you? |
| 09:50:09 | 7 | A. No, sir. |
| 09:50:09 | 8 | Q. You didn't? |
| 09:50:10 | 9 | A. No, sir. |
| 09:50:10 | 10 | Q. It never got up to 2.2 million? |
| 09:50:13 | 11 | A. Yes, sir. |
| 09:50:14 | 12 | Q. But you're not responsible? |
| 09:50:17 | 13 | A. Not entirely, no. |
| 09:50:19 | 14 | Q. Who is? |
| 09:50:19 | 15 | A. Well, you know, I never could figure out |
| | 16 | why we bought so much in September. But it's my |
| | 17 | opinion that Quality Chekd was behind in their |
| | 18 | accounting system. And September 30th is the end |
| | 19 | of their year and so they had to get all these |
| | 20 | invoices done in September. |
| | 21 | And so -- and we do it every month. In |
| | 22 | other words, we try to close out our month every |
| | 23 | month and get every invoice we possibly can in |
| | 24 | November because -- I mean, yeah, in November in |
| | 25 | this case, because if we receive the product in |

Page 116

| | 1 | November and we don't book the purchase, then our |
| | 2 | inventory and balance will be out. In other |
| | 3 | words, it will appear that, well, you received |
| | 4 | this product in November and you inventoried it, |
| | 5 | but you don't put it on the books as a purchase |
| | 6 | until December. It distorts your financial |
| | 7 | statement. |
| 09:51:25 | 8 | Q. Let's go back to -- |
| 09:51:27 | 9 | A. No, no, no. Let's finish this. |
| 09:51:30 | 10 | Q. What is the question that you're |
| | 11 | answering? |
| 09:51:32 | 12 | MR. LOWRANCE: I'm going to object. |
| 09:51:33 | 13 | MR. HAMEL: Wait a minute. Wait a |
| | 14 | minute. |
| 09:51:34 | 15 | MR. LOWRANCE: He's entitled to |
| | 16 | finish his answer. |
| 09:51:36 | 17 | MR. HAMEL: I'm making an objection |
| | 18 | here. I'm objecting to the nonresponsiveness of |
| | 19 | the answer. I want to know what questions you |
| | 20 | think you're answering. |
| 09:51:42 | 21 | MR. LOWRANCE: And you can object |
| | 22 | to the nonresponsive of his answer when he's |
| | 23 | completed his answer. You don't have any right to |
| | 24 | interrupt and badger the witness -- |
| 09:51:49 | 25 | MR. HAMEL: I'm not badgering. |

Page 117

| 09:51:51 | 1 | MR. LOWRANCE: -- and prevent him |
| | 2 | from fully answering the question that you asked. |
| 09:51:54 | 3 | MR. HAMEL: I'm not going to let |
| | 4 | this witness ramble on and on and on and on and |
| | 5 | take my deposition time either. Now, if I can get |
| | 6 | an answer to my question, if he can tell me what |
| | 7 | the question is that he's answering that I asked, |
| | 8 | then I'll listen to his answer. |
| 09:52:09 | 9 | MR. LOWRANCE: That's not the |
| | 10 | question that's pending before the witness he |
| | 11 | is attempting to answer. You have inserted a new |
| | 12 | question by interrupting his answer. |
| 09:52:17 | 13 | MR. HAMEL: I'll withdraw the |
| | 14 | question. |
| 09:52:21 | 15 | Q. (BY MR. HAMEL) Now, you said that the |
| | 16 | accounts payable to Cohyco -- to Quality Chekd |
| | 17 | went up from 1.6 million to 2.2 million? |
| 09:52:32 | 18 | A. Yes, sir. |
| 09:52:33 | 19 | Q. And I asked you if you were responsible |
| | 20 | for that increase. And you hesitated and you said |
| | 21 | not totally? |
| 09:52:41 | 22 | A. That's right. |
| 09:52:42 | 23 | Q. All right. Now I'm talking about human |
| | 24 | beings when I say responsible. I'm not talking |
| | 25 | about circumstances. Did you run Hygeia on a |

Page 118

| | 1 | day-to-day basis? Did you run Hygeia from the |
| | 2 | time that the debt was 1.6 million until the time |
| | 3 | it climbed to 2.2 million? Were you running the |
| | 4 | day-to-day operations of Hygeia? |
| 09:53:03 | 5 | A. I was not the chief operating officer. |
| 09:53:05 | 6 | Q. I know you weren't. I'm asking if you |
| | 7 | ran Hygeia during that period of time regardless |
| | 8 | of your title. |
| 09:53:11 | 9 | A. I cannot say I ran the Hygeia since I |
| | 10 | was not the chief operating officer of the |
| | 11 | business. I did not run day-to-day operations. |
| 09:53:20 | 12 | Q. Did you keep track of the financial |
| | 13 | condition of Hygeia on a day-to-day basis? |
| 09:53:27 | 14 | A. Certain parts of it I did, yes. |
| 09:53:31 | 15 | Q. And including what was owed by the |
| | 16 | company, right? |
| 09:53:32 | 17 | A. Yes. |
| 09:53:33 | 18 | Q. And checks would be prepared and you |
| | 19 | would hold those checks and decide whether or not |
| | 20 | to release them; isn't that correct? |
| 09:53:40 | 21 | A. Yes, sir. |
| 09:53:41 | 22 | Q. All right. So you kept track of who was |
| | 23 | owed what at any given time during that period |
| | 24 | when the debt rose from 1.6 million to 2.2? |
| 09:53:52 | 25 | A. I kept track of those checks that had |

9 (Pages 115 to 118)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                           H. LEE RICHARDS

| Page 119 |
|---|

```
            1   been written.  I knew what that number was.
09:53:59    2       Q.  All right.  So and that's during the
            3   period when the debt from Hygeia to Quality Chekd
            4   rose from 1.6 to 2.2 million?
09:54:06    5       A.  Yes.
09:54:07    6       Q.  All right.
09:54:25    7           MR. HAMEL:  Mr. Hamel, we've
            8   been going about an hour.  Can we take a short
            9   break if you're at a stopping point?
09:54:35   10           MR. HAMEL:  Well, I mean, if you
           11   need to.  If anybody needs to take a break for the
           12   bathroom or because they just, you know, are
           13   weary, then I think five-minute break is in order.
09:54:43   14           MR. LOWRANCE:  I appreciate it.
09:54:44   15           MR. HAMEL:  Is that what it is?
09:54:45   16           MR. LOWRANCE:  Yes.
09:54:46   17           MR. HAMEL:  Okay.
           18           (Recess taken)
10:01:33   19       Q.  (BY MR. HAMEL)  Would you agree with
           20   me, Mr. Richards, that you were a fiduciary with
           21   respect to Quality Chekd when you were on the
           22   board of directors?
10:01:41   23       A.  No, sir.
10:01:42   24       Q.  You were not a fiduciary?
10:01:47   25       A.  I'm a buyer.  I'm a member of the
```

| Page 120 |
|---|

```
            1   association.
10:01:52    2       Q.  When you were serving as director on the
            3   election of the members, do you agree or disagree
            4   that you were a fiduciary with respect to Quality
            5   Chekd?
10:02:05    6       A.  I don't know how to define that.  I say
            7   in some ways I am.  I'm also a fiduciary to
            8   Quality Chekd, Hygeia and Cohyco.
10:02:18    9       Q.  Then you will agree with me that you
           10   were a fiduciary with respect to Quality Chekd?
10:02:24   11       A.  I think it depends on how you define
           12   fiduciary.
10:02:28   13       Q.  Well, if you're saying --
10:02:28   14       A.  Excuse me.
10:02:28   15       Q.  You answered that you were a fiduciary
           16   with respect to Cohyco and Hygeia.
10:02:35   17       A.  Yes, sir.
10:02:36   18       Q.  All right.  In that sense, were you a
           19   fiduciary with respect to Quality Chekd?
10:02:43   20       A.  In -- yes, I would say I am in relation
           21   to the duties I have with each of those
           22   organizations.
10:03:00   23       Q.  Would you agree that while you were
           24   serving as director of Quality Chekd if you caused
           25   Hygeia to borrow money from Quality Chekd that
```

| Page 121 |
|---|

```
            1   Hygeia could not pay back fully, that you had a
            2   duty to disclose that to Quality Chekd?
10:03:25    3       A.  Just like any other creditor.  And I
            4   didn't know until mid-November.  And I immediately
            5   called Mel Rapp, and we discussed the situation.
            6   And that's when I told him I could not pay him in
            7   full.
10:03:40    8       Q.  In mid-November?
10:03:41    9       A.  Yes, sir.
10:03:42   10       Q.  So you will agree with me -- are you
           11   saying that your call in mid-November was to
           12   advise Quality Chekd, because of your fiduciary
           13   duty, that you wouldn't be able to pay Quality
           14   Chekd in full?
10:03:55   15       A.  They were the only one I called, so I
           16   guess as you define it, that's right.
10:04:06   17       Q.  So would you then agree with me -- since
           18   you've agreed with the last question, would you
           19   agree with me that it would be a breach of a
           20   fiduciary duty for you to have caused Hygeia to
           21   borrow money from Quality Chekd knowing that you
           22   couldn't fully pay it back?
10:04:27   23       A.  I didn't do that.
10:04:28   24       Q.  I know.  But would you agree with me
           25   that if you did, it would be a breach of your
```

| Page 122 |
|---|

```
            1   fiduciary duty to Quality Chekd?
10:04:33    2           MR. LOWRANCE:  Object to the form
            3   as it calls for speculation.
10:04:36    4       A.  I did tell him at the moment almost that
            5   I found out I couldn't pay for it.
10:04:42    6       Q.  (BY MR. HAMEL)  You have told me that.
            7   And I'm just asking you whether or not you agree
            8   with me that you had a fiduciary duty to tell
            9   Quality Chekd -- if you borrowed money and could
           10   not pay it back, you had a duty to tell Quality
           11   Chekd when you were borrowing the money that you
           12   couldn't pay it back, you would have had a duty to
           13   tell Quality Chekd that?
10:05:06   14           MR. LOWRANCE:  Objection to the
           15   form of the question as it calls for speculation,
           16   calls for an expert opinion from this witness who
           17   is not qualified to give an expert opinion.
           18           Subject to that, you can answer it
           19   if you can.
10:05:21   20           MR. HAMEL:  Okay.  Go ahead.
10:05:24   21       A.  I don't know that any two people would
           22   agree when that moment took place.  But I agree
           23   that if I knew I couldn't pay him in full, I would
           24   tell him.  And I did.
10:05:39   25       Q.  (BY MR. HAMEL)  So you agree that if
```

10 (Pages 119 to 122)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                                   H. LEE RICHARDS

Page 131

1  day of the sale of assets, November 30th, 1999,
2  Hygeia owed a substantial amount of money to
3  Congress, didn't it?
10:16:36  4      A. Yes, sir.
10:16:38  5      Q. And that debt was guaranteed by Hygeia's
6  parent Cohyco, wasn't it?
10:16:45  7      A. You know, I don't recall. It very
8  likely was. But I don't remember right now. I
9  could look it up for you.
10:16:52  10     Q. You don't remember that?
10:16:53  11     A. No, I really don't remember. But I
12  suspect you're right.
10:16:57  13     Q. All right.
10:16:58  14     A. Okay.
10:16:59  15     Q. And when Hygeia's debt to Congress was
16  paid off out of the sale of assets to Southern,
17  the guarantee of Cohyco was released by Congress,
18  wasn't it?
10:17:21  19     A. Yes, sir.
10:17:23  20     Q. Okay. So would you agree with me that's
21  a benefit to Cohyco?
10:17:28  22     A. No, sir.
10:17:29  23     Q. Was it a detriment?
10:17:33  24     A. I don't think -- I don't know how to
25  define that. What I would say is that the sale

Page 132

1  would have not taken place unless that money was
2  used to pay Congress. And Cohyco had no funds to
3  pay Congress. So you would have had a big
4  bankruptcy of maybe both corporations if we had
5  done anything else than what we did.
10:17:59  6      Q. When Congress was paid with the proceeds
7  from the sale of the assets to Southern, Cohyco
8  was released from its guarantee, wasn't it?
10:18:09  9          MR. LOWRANCE: Objection.
10:18:10  10     A. Yes, I guess so.
10:18:13  11     Q. (BY MR. HAMEL) All right. Next,
12  there was a lien that Cohyco had on five pieces of
13  Hygeia real estate prior to November 30th, 1999,
14  wasn't there? Deed of trust lien?
10:18:37  15     A. Prior to November 1999 --
10:18:40  16     Q. November 30th, 1999.
10:18:40  17     A. -- there was a period when Hygeia had
18  everything mortgaged to Cohyco.
10:18:45  19     Q. Let me restate my question,
20  Mr. Richards.
10:18:48  21     A. Okay.
10:18:49  22     Q. After Congress provided the funding to
23  Hygeia, Congress had the lien on everything
24  including the first lien on the real estate of
25  Hygeia. But Cohyco had a second lien secured by a

Page 133

1  deed of trust on five parcels of real estate owned
2  by Hygeia on November 30th of 1999; isn't that
3  correct?
10:19:16  4      A. Hygeia had -- excuse me. Cohyco had
5  subordinated their lien on all of the real estate
6  of Hygeia's in order to get the loan from
7  Congress.
10:19:30  8      Q. Right.
10:19:32  9      A. And when Congress was paid, that
10  property that was not sold to Southern Foods was
11  mortgaged still to Cohyco, and they foreclosed.
10:19:56  12     Q. So Cohyco then was free to foreclose
13  after Congress was paid off out of the sale
14  proceeds from Southern, right?
10:20:03  15     A. Sure.
10:20:04  16     Q. And Cohyco did foreclose its lien on
17  five pieces of real estate and got $1.9 million,
18  didn't it?
10:20:17  19     A. I don't know that Cohyco got any cash.
10:20:20  20     Q. Did it get a credit to -- what happened
21  on the foreclosure? Where did the money go? Who
22  got the real estate?
10:20:30  23     A. Well, Hygeia -- the five pieces of
24  property went to Cohyco.
10:20:35  25     Q. Has Cohyco sold those properties?

Page 134

10:20:38  1      A. They sold one for $150,000.
10:20:40  2      Q. Do you know what the credit was that was
3  allowed for the five pieces of property on the
4  debt?
10:20:46  5      A. A million and a half.
10:20:47  6      Q. All right. Million and a half. I said
7  1.9. But it's a million and a half, right?
10:20:52  8      A. Yes, sir.
10:20:52  9      Q. So this was a benefit to Cohyco, wasn't
10  it?
10:20:59  11     A. Not until they're sold. It's a
12  liability right now.
10:21:02  13     Q. Well, even having any real estate at all
14  is an asset that Cohyco didn't have before
15  November 30th of 1999. They got the title when
16  they foreclosed in the year 2000, right?
10:21:14  17     A. Yes, sir.
10:21:15  18     Q. All right. So that's an asset that
19  Cohyco got as a result of the sale to Southern,
20  isn't it?
10:21:22  21     A. They did because they were a lender.
10:21:28  22     Q. Okay. Now --
10:21:38  23     A. A secured lender.
10:21:40  24     Q. In January of 1999, you went to Texas
25  State Bank and borrowed $400,000 personally.

13 (Pages 131 to 134)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                                                    H. LEE RICHARDS

Page 135

```
             1  didn't you?
10:21:48     2     A.  Yes, sir.
10:21:49     3     Q.  What did you do with the money?
10:21:50     4     A.  I loaned it to Carancahua.
10:21:54     5     Q.  And what did Carancahua do with the
             6  money?
10:21:57     7     A.  They paid it to Cohyco.
10:22:00     8     Q.  What did Cohyco do with the money?
10:22:03     9     A.  They -- let's see.  Carancahua loaned it
            10  to Cohyco; Cohyco loaned it to Hygeia.
10:22:10    11     Q.  Okay.  So you borrowed that money for
            12  the express purpose of providing additional cash
            13  to Hygeia, didn't you?
10:22:19    14     A.  Yes, sir.
10:22:20    15     Q.  All right.
10:22:20    16     A.  In order to pay the creditors.
10:22:22    17     Q.  And that was in January of 1999, wasn't
            18  it?
10:22:26    19     A.  Yes, sir.
10:22:26    20     Q.  So you told me earlier that Hygeia was
            21  beginning to show a positive cash flow by April of
            22  1999 and that's why you decided to go back to
            23  Schenkel?
10:22:40    24     A.  Yes, sir.
10:22:41    25     Q.  Okay.  And so why was the money
```

Page 136

```
             1  necessary?  Why did you have to infuse $400,000
             2  personally into Hygeia?
10:22:52     3     A.  Because we had lost a ton of money in
             4  the previous months.
10:23:00     5     Q.  So it was aimed at keeping the ship
             6  afloat, so to speak?
10:23:05     7     A.  It was aimed at satisfying the creditors
             8  as best we could.
10:23:12     9     Q.  Now, when the proceeds from the sale to
            10  Southern were paid, that $400,000 by then had been
            11  reduced to 300,000.  And that debt was paid off,
            12  wasn't it?
10:23:38    13     A.  Yes, sir.
10:23:39    14     Q.  And until that debt was paid off, you
            15  were on the hook personally to Texas State Bank
            16  for $300,000, weren't you?
10:23:47    17     A.  Yes, sir.
10:23:48    18     Q.  So you benefitted by the sale of the
            19  assets to Southern, didn't you?
10:23:54    20     A.  I would say Cohyco benefitted because I
            21  held property worth probably $600,000 as
            22  collateral on that $300,000 loan.
10:24:08    23     Q.  You nevertheless would have had to
            24  foreclose and sell that property yourself, right?
10:24:11    25     A.  Yes.
```

Page 137

```
10:24:12     1     Q.  And you got released from your guarantee
             2  by Texas State Bank when the bank was paid on your
             3  note?
10:24:20     4     A.  I would have profited greatly if I had
             5  foreclosed.
10:24:23     6     Q.  You got your note cancelled by Texas
             7  State Bank, didn't you?
10:24:31     8     A.  It was paid off.
10:24:32     9     Q.  And your note was returned to you,
            10  wasn't it?
10:24:35    11     A.  Yes, sir.
10:24:36    12     Q.  All right.  Now, as a result of the sale
            13  to Southern, you also got an employment contract,
            14  didn't you?
10:24:53    15     A.  Yes, sir.
10:24:54    16     Q.  Does it require you to work?
10:24:57    17     A.  The contract doesn't, but the verbal
            18  agreement does.
10:25:00    19     Q.  All right.  And your sister got a
            20  contract, didn't she?
10:25:06    21     A.  Yes, sir.
10:25:06    22     Q.  All right.  And your sister and you at
            23  the time of the sale were both directors of Hygeia
            24  and directors of Cohyco?
10:25:17    25     A.  Yes, sir.
```

Page 138

```
10:25:18     1     Q.  All right.  Now, after the sale to
             2  Southern, Hygeia continued to own the five
             3  subsidiaries in Mexico; is that correct?
10:25:31     4     A.  Four, yes.
10:25:32     5     Q.  Four?
10:25:32     6     A.  Uh-huh.
10:25:33     7     Q.  And part of the deal you negotiated was
             8  to have Southern enter into a purchase -- asset
             9  purchase agreement with -- excuse me -- a supply
            10  agreement with those Mexican subsidiaries, didn't
            11  you?
10:25:49    12     A.  Yes.
10:25:49    13     Q.  And part of that agreement was that
            14  Southern would supply the first $200,000 of ice
            15  cream or other product to those subsidiaries free;
            16  isn't that right?
10:25:59    17     A.  Yes, sir.
10:26:01    18     Q.  Okay.  Hygeia and its -- Hygeia
            19  benefitted to that extent that it kept in business
            20  with the help of Southern with $200,000 it had
            21  been given by Southern, in effect, to the Mexican
            22  subsidiaries?
10:26:23    23     A.  I would say that that kind of agreement
            24  is very common in our industry where a dairy
            25  supplier will pay cash actually in front or they
```

14 (Pages 135 to 138)

Page 155

10:51:05 1    Q.  Now, are you aware that Cohyco,
2    initially in its bankruptcy filings, claims the
3    status as a secured creditor of Hygeia?
10:51:19 4    A.  Yes, sir.
10:51:20 5    Q.  And do you remember how much it was
6    claiming?  It was claiming the principal plus
7    unpaid interest of some two or $3 million?
10:51:27 8    A.  I don't think so.
10:51:28 9    Q.  You don't think so?
10:51:33 10   A.  I'm not sure that that was in the
11   bankruptcy.  I think that was communicated.
10:51:37 12   Q.  Did you look at the schedules and claims
13   that Cohyco filed in the bankruptcy court?
10:51:43 14   A.  No, I really haven't.
10:51:45 15   Q.  Did you know that Cohyco asserted a
16   claim for whatever it was owed by Hygeia?
10:51:52 17   A.  I recall that at one time we thought
18   that we still held the -- all the assets, the
19   equipment and cash and receivables.  We thought we
20   had that and we just had forgotten that we had
21   waived that in favor of Congress.
10:52:26 22   Q.  Well, let's just simplify it.  When
23   Cohyco filed a proof of claim in Hygeia's
24   bankruptcy, Cohyco asserted a right to collect
25   over $10 million from Hygeia's assets as a secured

Page 156

1    creditor, right?
10:52:43 2    A.  I had nothing to do with that.
10:52:45 3    Q.  But it did, didn't it?
10:52:46 4    A.  I don't know that.
10:52:48 5    Q.  You don't know that?
10:52:48 6    A.  No, sir, I don't.
10:52:48 7    Q.  You're the chairman of the board of
8    Cohyco at the time the proof of claim was filed,
9    and you don't know what the claim was about?
10:52:56 10   A.  No, sir, I don't.
10:52:58 11   Q.  You know that it was later amended,
12   though?
10:53:03 13   A.  I really thought that it was adjusted
14   prior to the claim.
10:53:11 15   Q.  Well, who at Cohyco authorized the
16   filing of the proof of claim?
10:53:20 17   A.  I would guess Doug Purl, but I'm not
18   sure.  You know, I have had nothing to do with
19   this bankruptcy since in December I told Mel Rapp
20   that all his communications would be with Doug
21   Purl.  And when Doug Purl and my sister told me
22   that they were going to go and offer 15 cents on
23   the dollar, I said, that's fine.  You go do it
24   because I'll have nothing to do with it.
10:53:52 25   Q.  Is that because you were embarrassed

Page 157

1    that you owed so much money to Cohyco?
10:53:55 2    A.  No, sir.  That was because I had a plan
3    that I thought was better.
10:53:57 4    Q.  Okay.  But when you got overruled, were
5    you embarrassed that your company owed so much
6    money to Quality Chekd on whose board you had sat
7    for many, many years?
10:54:07 8    A.  I've been embarrassed since
9    November 15th of 1999.
10:54:11 10   Q.  All right.
10:54:12 11   A.  And I have grieved deeply for all the
12   damned problems.  And I am terribly sorry.
10:54:20 13   Q.  All right.  So you're embarrassed?
10:54:21 14   A.  No, sir.  I am just -- I feel awful.
15   And embarrassed is part of that, I would guess.
10:54:28 16   Q.  All right.  That's what my question was.
17   Now, have your brother and -- I mean
18   your sister and your -- what is Doug to you?
10:54:39 19   A.  Nephew.
10:54:40 20   Q.  Have your sister and your nephew changed
21   their tune by agreeing to treat the secured debt
22   that they first claimed on behalf of Cohyco as
23   unsecured debt?
10:54:53 24   A.  They changed their tune because they
25   found out that, number one, we didn't have those

Page 158

1    items of collateral they thought we had.  And they
2    have a legal right to do that for Cohyco.
10:55:13 3    Q.  Okay.  So now Cohyco is asserting a
4    claim for approximately $12 million as an
5    unsecured creditor.  You know that, don't you?
10:55:28 6    A.  Yes.
10:55:29 7    Q.  Okay.  And you know that its pro rata
8    portion of all of the unsecured debt is over
9    70 percent as an unsecured creditor, don't you?
10:55:44 10   A.  Yes, sir.
10:55:45 11   Q.  Okay.  So when the first claim was filed
12   as a secured claim, it would have wiped out all of
13   the assets.  So that means that Cohyco would have
14   gotten 100 percent of whatever was in the
15   bankruptcy court of Hygeia?
10:56:00 16   A.  I guess that's right.
10:56:01 17   Q.  All right.  And today if it succeeds in
18   its unsecured claim, it will get 70 percent, won't
19   it?
10:56:09 20   A.  That's about right.
10:56:11 21   Q.  All right.  Do you think that's fair to
22   Quality Chekd?
10:56:17 23   A.  I think what I proposed was fair.
10:56:20 24   Q.  Do you think it's fair for Cohyco to
25   take 70 percent of the assets as an unsecured

19 (Pages 155 to 158)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                          H. LEE RICHARDS·

Page 159

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | creditor when the rest of the unsecured creditors,       |
|         | 2  | like Quality Chekd, are out there holding the bag?       |
| 10:56:35 | 3  | A.  I wouldn't have done it that way.                    |
| 10:56:37 | 4  | Q.  Do you think it's fair?  That's the                  |
|         | 5  | question.                                                |
| 10:56:40 | 6  | A.  I don't know whether you -- I think it's             |
|         | 7  | legal.                                                    |
| 10:56:41 | 8  | Q.  All right.  But do you think it's fair?              |
| 10:56:44 | 9  | A.  Some people say if it's legal, it's                  |
|         | 10 | fair.                                                     |
| 10:56:47 | 11 | Q.  All right.                                            |
| 10:56:48 | 12 | A.  I don't agree with that.                             |
| 10:56:51 | 13 | Q.  I think you agreed with me earlier that             |
|         | 14 | Hygeia, in effect, on the backs of the general           |
|         | 15 | unsecured creditors, was able to keep its business       |
|         | 16 | going.  And now today it claims 70 percent of the        |
|         | 17 | assets as an unsecured creditor, leaving all of          |
|         | 18 | the general unsecured creditors to get something         |
|         | 19 | like 10 or 15 percent of the assets or 30, but           |
|         | 20 | certainly less than 100 percent.  Now, do you            |
|         | 21 | think that's fair?                                        |
| 10:57:24 | 22 | MR. LOWRANCE:  Objection to the                          |
|         | 23 | form of the question.  It's argumentative,               |
|         | 24 | badgering, misstates previous testimony.                 |
| 10:57:30 | 25 | A.  I think --                                           |

Page 160

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 10:57:31 | 1  | Q.  (BY MR. HAMEL) All right.  Regardless                |
|         | 2  | of whether it's legal, do you think that it is           |
|         | 3  | fair for Cohyco to assert a position as a general        |
|         | 4  | unsecured creditor in Hygeia's bankruptcy thereby        |
|         | 5  | preventing the other general unsecured creditors         |
|         | 6  | from receiving as great a value as they could from       |
|         | 7  | the assets of Hygeia?                                     |
| 10:57:55 | 8  | A.  Would you repeat that?                               |
| 10:57:56 | 9  | Q.  Yeah.  Do you think it's fair,                       |
|         | 10 | regardless of whether it's legal, for Cohyco to          |
|         | 11 | assert its position as an unsecured creditor of          |
|         | 12 | Hygeia to the detriment of the other lesser             |
|         | 13 | general unsecured creditors of Hygeia?                   |
| 10:58:17 | 14 | A.  I think it's legal.                                  |
| 10:58:19 | 15 | Q.  Do you think it's fair?                              |
| 10:58:20 | 16 | A.  I don't know whether it's fair or not.               |
|         | 17 | I wouldn't do it that way.  That's the best answer       |
|         | 18 | I can give you.                                           |
| 10:58:25 | 19 | Q.  Are you in a position to control the                 |
|         | 20 | decision of Cohyco?                                       |
| 10:58:29 | 21 | A.  No, sir.                                             |
| 10:58:32 | 22 | Q.  Is that a shareholder decision or is                |
|         | 23 | that a decision of the three directors?                  |
| 10:58:38 | 24 | A.  I think that I told you yesterday that              |
|         | 25 | it was a decision of the three directors and that       |

Page 161

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | Doug Purl had told me that the largest major             |
|         | 2  | shareholder other than the family had agreed to          |
|         | 3  | that.                                                    |
| 10:58:59 | 4  | Q.  Do you embrace the adversary claim that             |
|         | 5  | Cohyco has filed against Quality Chekd to, quote,       |
|         | 6  | equity in Quality Chekd?                                 |
| 10:59:11 | 7  | MR. LOWRANCE:  Objection to the                         |
|         | 8  | form of the question as being vague.                     |
| 10:59:18 | 9  | Q.  (BY MR. HAMEL)  Do you know that                    |
|         | 10 | Cohyco -- excuse me -- Hygeia has asserted a claim       |
|         | 11 | against Quality Chekd --                                 |
| 10:59:26 | 12 | A.  Yes, sir.                                            |
| 10:59:26 | 13 | Q.  -- in an adversary proceeding?                      |
| 10:59:28 | 14 | A.  Yes.                                                 |
| 10:59:29 | 15 | Q.  Okay.  And you know that part of that               |
|         | 16 | claim is a claim that Hygeia is entitled to some         |
|         | 17 | of the, quote, equity in Quality Chekd, don't you?      |
| 10:59:41 | 18 | A.  Yes, sir.                                            |
| 10:59:43 | 19 | Q.  Okay.  You know from your tenure on the             |
|         | 20 | board of directors of Quality Chekd that a member       |
|         | 21 | has never been paid when the member left, Quality       |
|         | 22 | Chekd's Associated has never been paid any of           |
|         | 23 | that, quote, equity, don't you?                         |
| 10:59:59 | 24 | A.  Yes, sir.                                            |
| 11:00:00 | 25 | Q.  Okay.  Is that a claim that you support?            |

Page 162

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | Do you think it's a proper claim?                        |
| 11:00:07 | 2  | A.  I think it's a proper claim in that I               |
|         | 3  | think Quality Chekd has been inconsistent in the        |
|         | 4  | bylaws of the corporation.                               |
| 11:00:18 | 5  | Q.  In what respect?                                     |
| 11:00:20 | 6  | A.  I think that -- my understanding -- and             |
|         | 7  | I'm not an expert in Wisconsin cooperative law or        |
|         | 8  | even the policy -- I mean the regulations or the         |
|         | 9  | documents in Quality Chekd.                              |
|         | 10 | But my impression was that if a company                  |
|         | 11 | purchased a Quality Chekd company and purchased          |
|         | 12 | the stock, that it was entitled to the equity; but       |
|         | 13 | if they purchased just the assets, then they were        |
|         | 14 | not entitled to the equity.  And I have reason to        |
|         | 15 | believe that Quality Chekd has transferred that          |
|         | 16 | equity regardless of whether or not one of these        |
|         | 17 | other two conditions took place.  In other words,        |
|         | 18 | they transferred the equity whether the stock was        |
|         | 19 | purchased or whether the assets were purchased.          |
| 11:01:13 | 20 | Q.  In either event?                                     |
| 11:01:15 | 21 | A.  Yes, sir.  And if Southern Foods is                 |
|         | 22 | entitled to our equity, I think they should have         |
|         | 23 | it, regardless of what documents might say.  But         |
|         | 24 | if it's been Quality Chekd's practice to transfer        |
|         | 25 | that equity regardless of which of those two             |

20 (Pages 159 to 162)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                                    H. LEE RICHARDS

Page 215

```
            1   that at no time after September 9th of 1996 did
            2   Mel Rapp or anyone at Quality Chekd ask you for
            3   your personal guarantee?
13:02:40    4     A.  I don't recall if it was ever asked for
            5   until November of '99.
13:02:47    6     Q.  Are you saying it didn't happen or are
            7   you just saying that you don't recall?
13:02:54    8     A.  Okay.  I forget sometimes.  But I do not
            9   recall ever being requested prior to November of
           10   '99.
13:03:44   11     Q.  Now, the letter we just talked about,
           12   Rapp Exhibit 14, was dated September the 11th of
           13   1996.  Let me show you an internal memo from Mel
           14   Rapp to the president of the company dated
           15   September 23rd, 1996, that is, president of
           16   Quality Chekd.  And let me read it to you.  It
           17   concerns Hygeia receivables.  And it says, a good
           18   news update.  For perhaps the last ten days, which
           19   would indicate from September the 13th forward,
           20   Hygeia and Ice Cream Specialty balances have been
           21   current -- virtually current or less than 21 days.
           22   Something has changed, although I do not know
           23   exactly what.  Expect to see Lee at IDFA in
           24   Dallas.  If current status continues, there is no
           25   basis for us to proceed further based on our past
```

Page 216

```
            1   procedures.  Did I read that right?
13:04:48    2     A.  Yes, sir.
13:04:49    3         MR. LOWRANCE:  Let me object at
            4   this point, Lee, and see if we can clarify the
            5   record, because I think your question indicated
            6   that the previous letter had been marked as Rapp
            7   Exhibit 11.  And my note -- even though you've
            8   taken the document back, my note indicates it was
            9   Rapp Exhibit 14.
13:05:08   10         MR. HAMEL:  If I said 14 -- 11, I
           11   meant Rapp Exhibit 14 dated September the 11th of
           12   1996.
13:05:15   13         MR. LOWRANCE:  I think you said
           14   Exhibit 11.
13:05:16   15         MR. HAMEL:  I'll ask the reporter
           16   to correct that then.
13:05:22   17     Q.  (BY MR. HAMEL)  After your dialogue
           18   with Mr. Rapp, including your letter of
           19   September 9th where you said, I reject your
           20   ultimatum, did you cause Hygeia to do something to
           21   change the way it made its payments to Quality
           22   Chekd so that Hygeia's accounts were now virtually
           23   current or current with Quality Chekd?
13:05:48   24     A.  I didn't change anything.
13:05:49   25     Q.  Do you know if your people did?
```

Page 217

```
13:05:52    1     A.  I don't know whether they did or not.
            2   But they didn't do it at my direction.
13:05:58    3     Q.  At that time, were you president of
            4   Hygeia?
13:06:03    5     A.  '96?  No.
13:06:06    6     Q.  Doug was?
13:06:07    7     A.  Either Doug or Don Smith.  That was
            8   about when the transition took place.
13:06:13    9     Q.  And did you keep them in the loop on the
           10   difficulties that you were having about account
           11   balances of Quality Chekd?
13:06:20   12     A.  I don't know whether I kept Don Smith,
           13   but Bill Warner and I were working very closely on
           14   the Quality Chekd.
13:06:29   15     Q.  And Bill Warner was whom?
13:06:32   16     A.  He was our comptroller.
13:06:34   17     Q.  And do you know if Bill Warner made a
           18   special effort to get the payments in timely so
           19   that --
13:06:40   20     A.  I don't know whether he did or not.
13:06:42   21     Q.  Okay.  Well, certainly, if he did, it
           22   would have been something that you would have
           23   approved of, right?
13:06:49   24     A.  I don't know that he made any material
           25   change.  And I probably would have told him to
```

Page 218

```
            1   keep doing it like we've been doing it.
13:07:03    2     Q.  When you say like we've been doing it,
            3   was it your intent to avoid an interest charge?
13:07:11    4     A.  No, sir.  Just keep mailing two days
            5   prior to the due date.
13:07:15    6     Q.  Okay.  And incur an interest charge if
            7   the mailman was late?
13:07:20    8     A.  Sure.
13:08:28    9     Q.  I'm handing you a Deloitte & Touche
           10   independent auditor's report, the second page of
           11   which is -- for Hygeia, the second page of which
           12   is dated September 9, '96.  Is that the one you
           13   have in front of you?
13:08:43   14     A.  Yes, sir.
13:08:44   15     Q.  Would you turn to the third page of that
           16   report where the loss is reported for the fiscal
           17   year ending September 30, 1996 and compared with
           18   the prior year?
13:08:59   19     A.  Yes, sir.
13:09:00   20     Q.  Your operations from the prior year
           21   improved so that you had a loss of only a million
           22   two that year, right, as opposed to 4.6 the prior
           23   year?
13:09:13   24     A.  Are you looking at the income statement?
13:09:15   25     Q.  I'm looking at page 3 of the results of
```

34 (Pages 215 to 218)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                      H. LEE RICHARDS

---

Page 219

1 the consolidated operations of Hygeia and
2 subsidiaries.
13:09:27  3    A.  Yes.
13:09:36  4    Q.  Okay.  Hand that back.  Let me show you
5 the minutes of a meeting of the Cohyco board for
6 June 24th, 1997.  This is the board resolution,
7 isn't it, that authorized you to borrow money from
8 Congress?
13:11:04  9    A.  Yes, sir.
13:11:11  10   Q.  And did you shortly after that date
11 borrow money from Congress?
13:11:15  12   A.  Yes, sir.
13:11:21  13   Q.  Let me show you what was Purl Deposition
14 Exhibit 2, entitled Revolving Credit and Term Loan
15 Facility By and Between Congress Financial
16 Corporation and Hygeia Dairy, dated July 28, 1997.
17 Is that about the date that Hygeia borrowed money
18 from Congress Financial?
13:11:50  19   A.  Yes, sir.
13:11:59  20   Q.  Now, with respect to that loan, do you
21 remember what the original term of the loan or
22 loans under this revolving credit and term loan
23 contract were?  In other words, how long did
24 Hygeia have to pay the --
13:12:27  25   A.  I think July of '99.

---

Page 220

13:12:29  1    Q.  July of '99?
13:12:30  2    A.  Yeah, but I'm not sure.
13:12:35  3    Q.  And I think you said yesterday that at
4 some time the company went into technical default
5 in its covenants --
13:12:47  6    A.  Yes, sir.
13:12:49  7    Q.  -- on the various loans.  Do you know
8 when the company first went into technical
9 default?
13:12:57  10   A.  No, sir, I don't.
13:12:58  11   Q.  Was it 1998?
13:13:02  12   A.  I don't think so.  But I don't know when
13 it was.
13:13:15  14   Q.  Do you remember the condition or conduct
15 that caused Hygeia to be in technical default of
16 its loan obligations to Congress?
13:13:31  17   A.  No, sir, I don't remember what it was.
13:13:34  18   Q.  Was it failure to pay any principal or
19 interest payment?
13:13:38  20   A.  No, no.  Those were taken care of.  I
21 think it had something related to earnings or
22 ratios or something like that.
13:13:48  23   Q.  Okay.  I'm showing you the Deloitte &
24 Touche independent auditor's report dated on the
25 second page December 9, 1997 and on the third page

---

Page 221

1 reporting a net loss on operations for the years
2 ending September 30th, 1997 compared with 1996.
3 Do you see that?
13:15:02  4    A.  Yes, sir.
13:15:03  5    Q.  And the net loss in 1997 was 1,500,000
6 in round terms?
13:15:09  7    A.  Yes, sir.
13:15:11  8    Q.  Compared with a '96 loss of a million
9 two?
13:15:14  10   A.  Yes, sir.
13:15:15  11   Q.  Was this financial information at any
12 time, to your knowledge, disclosed to Quality
13 Chekd?
13:15:21  14   A.  No, sir.
13:15:40  15   Q.  In April of 1998, did you or anyone at
16 Hygeia have an occasion to deal with Meadow Gold
17 Dairies?
13:15:54  18   A.  Meadow Gold?  My mind is -- memory is
19 slipping.  Meadow Gold.  That would have been the
20 Beatrice Group at one time or something.  Okay.
21 Yes.  I know of Meadow Gold Dairies, yes, sir.
13:16:23  22   Q.  What was Meadow Gold Dairies doing to
23 Hygeia or for Hygeia?
13:16:39  24   A.  I don't remember that they were doing
25 anything.

---

Page 222

13:16:41  1    Q.  Meadow Gold Dairies -- do you know who
2 owned Meadow Gold Dairies?
13:16:46  3    A.  It was the Borden group.
13:16:47  4    Q.  The Borden group?
13:16:49  5    A.  At this time.
13:16:50  6    Q.  Were you asking the Borden group, if you
7 know, to take a look at your income trends or your
8 sales of ice cream or novelties?
13:17:04  9    A.  I had nothing to do with Meadow Gold.
13:17:09  10   Q.  Who is S. Brewer and T. Ward.  Do you
11 know them?  Or Bob Lake?
13:17:20  12   A.  The name Bob Lake sounds familiar.  But
13 I have no particular experience.
13:17:29  14   Q.  I'll represent to you that this comes
15 from the deposition of Patrick Keith Ford taken on
16 July 17th in the bankruptcy proceeding.
13:17:41  17   A.  Okay.  I guess they owned Meadow Gold at
18 that time.  I didn't look at the date on this
19 thing.  Yeah, they owned Meadow Gold.  Southern
20 Foods owned Meadow Gold at that time.
13:17:52  21   Q.  Okay.  Now, do you recall dealing with
22 Southern Foods about this time period, April of
23 '98?
13:18:07  24   A.  Yes, sir.  And during the winter and
25 spring of '98, I did contact them and may have

---

35 (Pages 219 to 222)

QUALITY CHEK'D DAIRIES,INC. VS COHYCO, INC.,ET AL                    H. LEE RICHARDS

Page 219

1 the consolidated operations of Hygeia and
2 subsidiaries.
13:09:27 3    A. Yes.
13:09:36 4    Q. Okay. Hand that back. Let me show you
5 the minutes of a meeting of the Cohyco board for
6 June 24th, 1997. This is the board resolution,
7 isn't it, that authorized you to borrow money from
8 Congress?
13:11:04 9    A. Yes, sir.
13:11:11 10    Q. And did you shortly after that date
11 borrow money from Congress?
13:11:15 12    A. Yes, sir.
13:11:21 13    Q. Let me show you what was Purl Deposition
14 Exhibit 2, entitled Revolving Credit and Term Loan
15 Facility By and Between Congress Financial
16 Corporation and Hygeia Dairy, dated July 28, 1997.
17 Is that about the date that Hygeia borrowed money
18 from Congress Financial?
13:11:50 19    A. Yes, sir.
13:11:59 20    Q. Now, with respect to that loan, do you
21 remember what the original term of the loan or
22 loans under this revolving credit and term loan
23 contract were? In other words, how long did
24 Hygeia have to pay the --
13:12:27 25    A. I think July of '99.

Page 220

13:12:29 1    Q. July of '99?
13:12:30 2    A. Yeah, but I'm not sure.
13:12:35 3    Q. And I think you said yesterday that at
4 some time the company went into technical default
5 in its covenants --
13:12:47 6    A. Yes, sir.
13:12:49 7    Q. -- on the various loans. Do you know
8 when the company first went into technical
9 default?
13:12:57 10    A. No, sir, I don't.
13:12:58 11    Q. Was it 1998?
13:13:02 12    A. I don't think so. But I don't know when
13 it was.
13:13:15 14    Q. Do you remember the condition or conduct
15 that caused Hygeia to be in technical default of
16 its loan obligations to Congress?
13:13:31 17    A. No, sir, I don't remember what it was.
13:13:34 18    Q. Was it failure to pay any principal or
19 interest payment?
13:13:38 20    A. No, no. Those were taken care of. I
21 think it had something related to earnings or
22 ratios or something like that.
13:13:48 23    Q. Okay. I'm showing you the Deloitte &
24 Touche independent auditor's report dated on the
25 second page December 9, 1997 and on the third page

Page 221

1 reporting a net loss on operations for the years
2 ending September 30th, 1997 compared with 1996.
3 Do you see that?
13:15:02 4    A. Yes, sir.
13:15:03 5    Q. And the net loss in 1997 was 1,500,000
6 in round terms?
13:15:09 7    A. Yes, sir.
13:15:11 8    Q. Compared with a '96 loss of a million
9 two?
13:15:14 10    A. Yes, sir.
13:15:15 11    Q. Was this financial information at any
12 time, to your knowledge, disclosed to Quality
13 Chekd?
13:15:21 14    A. No, sir.
13:15:40 15    Q. In April of 1998, did you or anyone at
16 Hygeia have an occasion to deal with Meadow Gold
17 Dairies?
13:15:54 18    A. Meadow Gold? My mind is -- memory is
19 slipping. Meadow Gold. That would have been the
20 Beatrice Group at one time or something. Okay.
21 Yes. I know of Meadow Gold Dairies, yes, sir.
13:16:23 22    Q. What was Meadow Gold Dairies doing to
23 Hygeia or for Hygeia?
13:16:39 24    A. I don't remember that they were doing
25 anything.

Page 222

13:16:41 1    Q. Meadow Gold Dairies -- do you know who
2 owned Meadow Gold Dairies?
13:16:46 3    A. It was the Borden group.
13:16:47 4    Q. The Borden group?
13:16:49 5    A. At this time.
13:16:50 6    Q. Were you asking the Borden group, if you
7 know, to take a look at your income trends or your
8 sales of ice cream or novelties?
13:17:04 9    A. I had nothing to do with Meadow Gold.
13:17:09 10    Q. Who is S. Brewer and T. Ward. Do you
11 know them? Or Bob Lake?
13:17:20 12    A. The name Bob Lake sounds familiar. But
13 I have no particular experience.
13:17:29 14    Q. I'll represent to you that this comes
15 from the deposition of Patrick Keith Ford taken on
16 July 17th in the bankruptcy proceeding.
13:17:41 17    A. Okay. I guess they owned Meadow Gold at
18 that time. I didn't look at the date on this
19 thing. Yeah, they owned Meadow Gold. Southern
20 Foods owned Meadow Gold at that time.
13:17:52 21    Q. Okay. Now, do you recall dealing with
22 Southern Foods about this time period, April of
23 '98?
13:18:07 24    A. Yes, sir. And during the winter and
25 spring of '98, I did contact them and may have

35 (Pages 219 to 222)

IN RE  F Street Investments, Inc. f/k/a/ Hygeia
_____
                    Debtor

_____
                  Joint Debtor

CASE NO  00-20953-B-11
                    (If Known)

CHAPTER  11

## SCHEDULE F (CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS)

*Continuation Sheet No. 100*

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on Schedule F

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| ACCT #<br>Zeph Technologies<br>P. O. Box 71685<br>Chicago, IL  60694 | | DATE INCURRED<br>CONSIDERATION<br>Goods Purchased or Services Rendered<br>REMARKS | | | | $826.31 |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |

Total for this Page (Sub-Total) >   $826.31

Running Total >   $5,091,763.98

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE.  F Street Investments, Inc. f/k/a/ Hygeia

CASE NO   00-20953-B-11

CHAPTER   11

## SUMMARY OF SCHEDULES

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | Yes | 1 | $0.00 | | |
| B - Personal Property | Yes | 4 | $4,033,890.22 | | |
| C - Property Claimed as Exempt | No | | | | |
| D - Creditors Holding Secured Claims | Yes | 1 | | $14,885,098.40 | |
| E - Creditors Holding Unsecured Priority Claims | Yes | 2 | | $2,941.81 | |
| F - Creditors Holding Unsecured Nonpriority Claims | Yes | 100 | | $5,091,763.98 | |
| G - Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H - Codebtors | Yes | 1 | | | |
| I - Current Income of Individual Debtor(s) | No | | | | N/A |
| J - Current Expenditures of Individual Debtor(s) | No | | | | N/A |
| Total Number of Sheets of ALL Schedules > | | 110 | | | |
| Total Assets > | | | $4,033,890.22 | | |
| Total Liabilities > | | | | $19,979,804.19. | |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:  F Street Investments, Inc. f/k/a/ Hygeia                CASE NO   00-20953-B-11

                                                               CHAPTER    11

## STATEMENT OF FINANCIAL AFFAIRS

*Continuation Sheet No. 6*

| | | | |
|---|---|---|---|
| Jorge Briones<br>vs. Hygeia Dairy Company<br>Cause No. 99-41071 | Appeal | USCA 5th | Pending |
| Dorothy Swan and Heather Licht Tagle<br>vs.<br>Hygeia et al<br>Cause No. 97-07-17035 | Sexual Assault | 229th District Court<br>Duval County, Texas | Pending |
| Melinda Villarreal<br>vs.<br>Hygeia Dairy Company et al<br>Cause No. 4938 | Sexual Assault | 229th District Court<br>Jim Hogg County, Texas | Pending |
| Elizabeth Gerold<br>vs.<br>Hygeia Dairy Company et al<br>Cause No. 99-10-54,066-B | Auto Liability | 135th District Court,<br>Victoria County, Texas | Pending |
| Fermina Sosa<br>vs.<br>Hygeia Dairy Company<br>Cause No. 1999-CCL-00873-C | Liability | County Court at Law No.<br>3, Brownsville,<br>Cameron County, Texas | Pending |

None
☑        b. Describe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

## 5. Repossessions, foreclosures and returns.

None
☐        List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure, or returned to the seller, within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION,<br>FORECLOSURE SALE,<br>TRANSFER OR RETURN | DESCRIPTION AND VALUE<br>OF PROPERTY | |
|---|---|---|---|
| Cobyco, Inc.<br>P. O. Box 751<br>Harlingen, TX  78551 | 01/04/00 | Victoria property | $149,000(Est.) |
| | 01/04/00 | Kingsville property | $120,000(Est.) |
| | 01/20/00 | Mercedes farm | $136,633(Actual) |
| | 01/04/00 | Harlingen plant | $600,000(Est.) |
| | 01/04/00 | Bayview farm | $902,300(Est. |

IN RE  F Street Investments, Inc. f/k/a/ Hygr'                    CA    00-20953-B-11
                                    Debtor                              (If Known)

                                                                 CHAPTER  11
                                    Joint Debtor

*AMENDED*
## SCHEDULE F (CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS)
*Continuation Sheet No  21*

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on Schedule F.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| ACCT # <br> **Coastal Engine Parts** <br> 4201 Agnes St. <br> Corpus Christi, TX  78405 | | DATE INCURRED <br> CONSIDERATION <br> Goods Purchased or Services Rendered <br> REMARKS | | | | $235.61 |
| ACCT #: <br> **Coastal Mart, Inc.** <br> C/O Michael J. McGinnis <br> Nine Greenway, Suite 800 <br> Houston, TX 77046 | | DATE INCURRED <br> CONSIDERATION <br> For goods purchased or services rendered <br> REMARKS | | | | $26,105.32 |
| ACCT #: <br> **Coastal Plating Company** <br> 534 McBride Lane <br> Corpus Christi, TX  78408 | | DATE INCURRED <br> CONSIDERATION <br> Goods Purchased or Services Rendered <br> REMARKS | | | | $1,524.40 |
| ACCT #: <br> **Cohyco, Inc.** <br> P.O. Box 751 <br> Harlingen, TX 78551 | | DATE INCURRED <br> CONSIDERATION <br> money advanced <br> REMARKS | | | | $12,543,905.58 |
| ACCT #: <br> **Coldstorage Maintenance, Inc.** <br> P. O. Box 2113 <br> Hurst, TX  76053 | | DATE INCURRED <br> CONSIDERATION <br> Goods Purchased or Services Rendered <br> REMARKS | | | | $2,970.03 |
| ACCT #: <br> **Coleman Diesel Service** <br> P. O. Box 8262 <br> Greenville, TX  75404 | | DATE INCURRED <br> CONSIDERATION <br> Goods Purchased or Services Rendered <br> REMARKS | | | | $327.45 |
| ACCT #: <br> **Collections Unlimited, Inc.** <br> 11225 n. 28th Drive <br> Phoenix, AZ  85029-5606 | | DATE INCURRED <br> CONSIDERATION <br> Goods Purchased or Services Rendered <br> REMARKS | | | | $297.91 |

Total for this Page (Sub-Total) >  $12,575,366.30

Running Total >  $13,209,842.13

IN RE  **F Street Investments, Inc. f/k/a/ Hyge'** _____    CAS   )  **00-20953-B-11**
                     Debtor                                                                              (If Known)

_____    CHAPTER  11
        Joint Debtor

## *AMENDED*
## SCHEDULE F (CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS)
*Continuation Sheet No. 106*

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on Schedule F.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM.  IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|
| ACCT #:<br>**Zeph Technologies**<br>**P. O. Box 71685**<br>**Chicago, IL  60694** | | DATE INCURRED<br>CONSIDERATION<br>**Goods Purchased or Services Rendered**<br>REMARKS | | | | $826.31 |
| ACCT #: | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT #. | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT #: | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT #: | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT #: | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |
| ACCT # | | DATE INCURRED<br>CONSIDERATION<br><br>REMARKS | | | | |

Total for this Page (Sub-Total) >     $826.31

Running Total >     $17,279,986.57

1ST CASE of Level 1 printed in FULL format.

DICK MOORE, KENNETH R. SCHELSTEDER, and PRESTON RAY VAN SHOUBROUEK,
Appellants v. MARION JAMES NOVARK, Appellee
No. 14-93-00794-CV
COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON
1995 Tex. App. LEXIS 2374
September 28, 1995, Rendered    September 28, 1995, Filed

NOTICE:

[*1] PURSUANT TO RULE 90(i) OF THE TEXAS RULES OF APPELLATE PROCEDURE, UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A COURT.

PRIOR HISTORY: On Appeal from the 151st District Court. Harris County, Texas. Trial Court Cause No. 86-36007.

DISPOSITION: Reversed and Rendered in part, Affirmed as Modified in Part,

CASE SUMMARY

PROCEDURAL POSTURE: Defendants, deputies and constable, appealed an order from the 151st District Court, Harris County (Texas), which granted plaintiff deputy damages for malicious prosecution, intentional infliction of emotional distress, and conspiracy. Defendant deputies claimed that the trial court erred in imposing sanctions and awarding attorney's fees. Defendant constable alleged he was entitled to official immunity for his firing of plaintiff.

OVERVIEW: Defendant deputy arrested a suspect for burglary. The suspect was handcuffed to a chair for questioning. Plaintiff deputy allegedly picked up a gun, pretended to put a bullet in it, and pulled the trigger. Plaintiff was fired. The federal government also investigated plaintiff. Plaintiff filed suit against defendants, two deputies and a constable, alleging malicious prosecution, intentional infliction of emotional distress, and conspiracy. Judgment for plaintiff was entered. Defendants appealed. Defendant deputies claimed that the trial court erred in imposing sanctions against their attorney and in awarding attorney's fees. Defendant constable claimed official immunity for firing plaintiff. The appellate court ruled that because the court's sanctions order issued after its plenary power had expired, the sanctions order was void. The constable was entitled to official immunity because he acted with probable cause, did not cause plaintiff's federal prosecution, and

properly exercised his legal right to discharge plaintiff, an at-will employee. Because no statute or agreement between the parties provided for attorney's fees for plaintiff's tort claims, the award was reversed.

OUTCOME: The appellate court affirmed in part and reversed in part the trial court's judgment for plaintiff deputy in his suit against defendants, deputies and constable, for malicious prosecution, intentional infliction of emotional distress, and conspiracy. Because defendant constable acted in his official capacity in firing plaintiff, he was entitled to official immunity. Because no statute provided for an attorney's fees award, the award was deleted.

CORE TERMS: deputy, constable, disclosure, malicious prosecution, intentional infliction of emotional distress, immunity, probable cause, conspiracy, gun, civil rights, prisoner, matter of law, plenary power, violating, malice, legal sufficiency, prosecuting, complain, evidence to support, sanctions order, outrageous, indictment, overrule, falsely, prejudgment interest, termination, federal authorities, affirmative defense, accuse, criminal prosecution

CORE CONCEPTS -

Civil Procedure: Appeals: Appellate Jurisdiction
To invoke the jurisdiction of a court of appeals in civil cases, a cost bond, cash deposit, or affidavit of inability must be timely filed. Tex. R. App. P. 40(a) and 41(a). Defects in the bond, cash deposit in lieu of bond, or notice of appeal may be amended.

Civil Procedure: Jurisdiction
Civil Procedure: Sanctions
A court's jurisdiction to act must be legally invoked or its power to act is nonexistent and its acts are void. Even a court's inherent judicial power does not confer jurisdiction where none exists. A motion for sanctions does not survive the expiration of the trial court's plenary jurisdiction. A court has no power to order sanctions after

its plenary power has expired. A trial court has no more power to act in granting sanctions without jurisdiction than it does in any other matter.

Civil Procedure: Jurisdiction
Civil Procedure: Sanctions
The only postjudgment proceedings over which a trial court retains jurisdiction after the expiration of its plenary power are proceedings to clarify or enforce a judgment. A sanctions order is characterized as an order nunc pro tunc. Tex. R. Civ. P. 316. Clerical errors in the entry of a judgment previously rendered may be corrected by a judgment nunc pro tunc after the court's plenary power has expired. A clerical error is a mistake or omission that prevented the judgment as entered from accurately reflecting the judgment that was rendered. A judicial error occurs when the court considered the issue and made an erroneous decision. If a court attempts to correct a judicial error by signing a judgment nunc pro tunc after the expiration of its plenary power, the judgment is void.

Civil Procedure: Entry of Judgments: Specific Acts
Civil Procedure: Appeals: Appellate Jurisdiction: Extraordinary Writs
Contempt orders are not reviewable by appeal. The validity of a contempt order can be attacked only by a writ of habeas corpus, or in limited circumstances, by a writ of mandamus.

Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
In a malicious prosecution case, proof must be positive, clear and satisfactory.

Civil Procedure: Appeals: Standards of Review: Substantial Evidence Rule
Courts of appeals have only two standards by which evidence is reviewed: factual sufficiency and legal sufficiency. A court of appeals cannot apply a third standard of reviewing the evidence, the clear and convincing standard. In reviewing a "no evidence" point, the appellate court must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences. If there is any evidence of probative force, that is, more than a scintilla of evidence, to support the finding, the point must be overruled. In considering the factual sufficiency of the evidence, the court must consider and weigh all of the evidence and may set aside the verdict and remand the cause for a new trial if the court concludes that the verdict is so against

the great weight and preponderance of the evidence as to be manifestly unjust.

Civil Procedure: Appeals: Standards of Review: Substantial Evidence Rule
When appellants challenge both the legal and factual sufficiency of the evidence supporting the jury's findings, the appellate court should first review the legal sufficiency challenges.

Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
When a defendant makes a full and fair disclosure of the facts to a prosecuting officer and the officer decides to prosecute, the defendant acts with probable cause and is not liable for malicious prosecution.

Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
Evidence of merely aiding or cooperating with prosecuting officials in causing a criminal prosecution will not support a verdict of malicious prosecution. A person does not procure a prosecution when the decision to prosecute is left to the discretion of another person, law enforcement official, or the grand jury.

Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
Mere surmise or suspicion amounts to no more than a scintilla of evidence.

Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
While malice may be inferred from the lack of probable cause, lack of probable cause can never be inferred from proof of malice.

Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
If a plaintiff fails to prove one or more of the elements of a cause of action for malicious prosecution, the claim fails as a matter of law.

Torts: Intentional Torts: Intentional Infliction of Emotional Distress
To support a claim of intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. The conduct reaching the level of outrageousness necessary for liability for

intentional infliction of emotional distress is described as being so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

**Labor & Employment Law: Employee Privacy**
An employer acts within his legal rights in investigating reasonably credible allegations of wrongdoing by his employees.

**Labor & Employment Law: Wrongful Discharge**
**Labor & Employment Law: Employment Relationships: At-Will Employment**
**Torts: Intentional Torts: Intentional Infliction of Emotional Distress**
The fact of discharge alone of an at-will employee cannot give rise to a claim for intentional infliction of emotional distress.

**Governments: State & Territorial Governments: Claims By & Against**
**Governments: State & Territorial Governments: Employees & Officials**
Under the doctrine of official immunity, public officials whose actions may be classified as discretionary enjoy immunity from personal liability as long as they act with good faith within the scope of their authority. Immunity will only be extended to officials performing discretionary duties as opposed to those performing ministerial duties, which require obedience to orders or the performance of duties over which the actor has no choice. Discretionary actions, sometimes referred to as quasi-judicial actions, are actions requiring personal deliberation, decision, and judgment. When a state employee gathers facts and then acts on those facts, his actions are quasi-judicial in nature.

**Governments: State & Territorial Governments: Claims By & Against**
**Governments: State & Territorial Governments: Employees & Officials**
An officer acts in good faith and is entitled to official immunity from liability if a reasonably prudent officer, under the same or similar circumstances, could have believed that his acts were justified.

**Civil Procedure: Jury Trials: Jury Instructions**
**Civil Procedure: Appeals: Standards of Review: Harmless & Invited Errors**
The trial court has wide discretion in submitting explanatory instructions and definitions. Instructions and definitions are proper when raised by the written pleadings, supported by the evidence, and they aid the jury

in answering the questions in the charge. Tex. R. Civ. P. 277, 278. If error in the charge is found, the appellate court then reviews the pleadings, evidence, and entire charge to determine if the error is harmful. In order to reverse a judgment based on error in the charge, an appellant must establish that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment. Tex. R. App. P. 81(b)(1).

**Governments: State & Territorial Governments: Claims By & Against**
**Civil Procedure: Jury Trials: Province of Court & Jury**
Immunity is a question of law for the court to decide at the earliest possible stage of litigation. A jury, however, if properly instructed, may decide the question of immunity if there is a disputed issue of material fact.

**Evidence: Witnesses**
**Civil Procedure: Jury Trials: Province of Court & Jury**
The jury, as the factfinder, is the sole judge of the credibility of the witnesses and the evidence, and should resolve any conflicts or inconsistencies in the evidence.

**Civil Procedure: Jury Trials: Jury Instructions**
**Civil Procedure: Appeals: Reviewability: Preservation for Review**
A request must be in substantially correct form to preserve error. Tex. R. Civ. P. 278. To be substantially correct, a request should be correct in substance and in the main, and it should not be affirmatively incorrect.

**Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences**
**Torts: Intentional Torts: Abuse of Process & Malicious Prosecution**
The issue of full and fair disclosure has been recognized as an element of proof in cases alleging malicious prosecution. A plaintiff has the burden to prove that a defendant failed to make a full and fair disclosure of the facts and circumstances known to him or her.

**Torts: Intentional Torts: Abuse of Process & Malicious Prosecution**
When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable, even though the information proves to be false and his belief was one that a reasonable man would not entertain.

**Torts: Intentional Torts: Abuse of Process & Malicious**

1995 Tex. App. LEXIS 2374, *1

Prosecution
Those accused of malicious prosecution are rightly aided by an initial presumption that a defendant acted reasonably in good faith and therefore had probable cause.

Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
In a malicious prosecution suit, the proper standard of causation is whether the defendant procured or initiated the criminal proceedings. "Initiated" does not ordinarily need to be defined because it is demonstrated by evidence that the defendant actually filed formal charges against the plaintiff, but "procurement" is defined as follows: A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Affirmative Defenses
Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
An affirmative defense permits a party to introduce evidence to establish an independent reason why its opponent should not prevail, not to rebut the factual proposition of its opponent's pleadings. An affirmative defense is one of avoidance, rather than a defense in denial. Full and fair disclosure is not an affirmative defense. Instead, a plaintiff must negate full and fair disclosure as part of his proof of the elements of the tort.

Torts: Intentional Torts: Abuse of Process & Malicious Prosecution
A prosecuting party acts with probable cause where, in good faith, he makes a full and fair disclosure of the facts and circumstances known to him at the time.

Civil Procedure: Jury Trials: Jury Instructions
Defendants, as well as plaintiffs, are entitled to an affirmative submission of each theory supported by the evidence.

Civil Procedure: Entry of Judgments: Multiple Claims & Parties
When the jury returns favorable findings on alternative theories, the prevailing party is entitled to seek recovery under an alternative theory if the judgment based on one

theory is reversed on appeal.

Torts: Multiple Defendants: Conspiracy
Business & Corporate Entities: Agency: Authority to Act: Agents Authority
A corporation cannot conspire with its employees because the acts of a corporation's agents are deemed to be the acts of the corporation itself.

Torts: Multiple Defendants: Conspiracy
Business & Corporate Entities: Agency: Authority to Act: Agents Authority
An exception to the intracorporate conspiracy defense is recognized when officers act for their own personal purposes.

Torts: Multiple Defendants: Conspiracy
These essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result of these acts.

Civil Procedure: Jury Trials: Jury Instructions
The failure to submit a properly worded question for inclusion in a charge waives a ground of recovery.

Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
Evidence: Witnesses: Examination & Presentation of Evidence
Torts: Multiple Defendants: Conspiracy
For a conspiracy claim, the evidence must show a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act that results in the injury; there must be a preconceived plan and unity of design and purpose. Proof of conspiracy may be, and usually must be, made by circumstantial evidence. Vital facts, however, may not be proved by unreasonable inferences or by inferences piled on inferences. Circumstantial evidence may by used to establish any material fact, but it must constitute more than mere suspicion or surmise.

Evidence: Witnesses
Civil Procedure: Jury Trials: Province of Court & Jury
When a jury is confronted with conflicting testimony, the appellate court cannot pass on the credibility of the witnesses nor substitute our findings for those of the jury, even though after reviewing the evidence the appellate court might have reached a different conclusion. It is the sole province of the trier of fact to judge the credibility and weight to be given to the testimony and to resolve any conflicts in the testimony of the witnesses.

1995 Tex. App. LEXIS 2374, *1

**Prosecution**
Those accused of malicious prosecution are rightly aided by an initial presumption that a defendant acted reasonably in good faith and therefore had probable cause.

**Torts: Intentional Torts: Abuse of Process & Malicious Prosecution**
In a malicious prosecution suit, the proper standard of causation is whether the defendant procured or initiated the criminal proceedings. "Initiated" does not ordinarily need to be defined because it is demonstrated by evidence that the defendant actually filed formal charges against the plaintiff, but "procurement" is defined as follows: A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

**Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Affirmative Defenses**
**Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences**
**Torts: Intentional Torts: Abuse of Process & Malicious Prosecution**
An affirmative defense permits a party to introduce evidence to establish an independent reason why its opponent should not prevail, not to rebut the factual proposition of its opponent's pleadings. An affirmative defense is one of avoidance, rather than a defense in denial. Full and fair disclosure is not an affirmative defense. Instead, a plaintiff must negate full and fair disclosure as part of his proof of the elements of the tort.

**Torts: Intentional Torts: Abuse of Process & Malicious Prosecution**
A prosecuting party acts with probable cause where, in good faith, he makes a full and fair disclosure of the facts and circumstances known to him at the time.

**Civil Procedure: Jury Trials: Jury Instructions**
Defendants, as well as plaintiffs, are entitled to an affirmative submission of each theory supported by the evidence.

**Civil Procedure: Entry of Judgments: Multiple Claims & Parties**
When the jury returns favorable findings on alternative theories, the prevailing party is entitled to seek recovery under an alternative theory if the judgment based on one theory is reversed on appeal.

**Torts: Multiple Defendants: Conspiracy**
**Business & Corporate Entities: Agency: Authority to Act: Agents Authority**
A corporation cannot conspire with its employees because the acts of a corporation's agents are deemed to be the acts of the corporation itself.

**Torts: Multiple Defendants: Conspiracy**
**Business & Corporate Entities: Agency: Authority to Act: Agents Authority**
An exception to the intracorporate conspiracy defense is recognized when officers act for their own personal purposes.

**Torts: Multiple Defendants: Conspiracy**
These essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result of these acts.

**Civil Procedure: Jury Trials: Jury Instructions**
The failure to submit a properly worded question for inclusion in a charge waives a ground of recovery.

**Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences**
**Evidence: Witnesses: Examination & Presentation of Evidence**
**Torts: Multiple Defendants: Conspiracy**
For a conspiracy claim, the evidence must show a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act that results in the injury; there must be a preconceived plan and unity of design and purpose. Proof of conspiracy may be, and usually must be, made by circumstantial evidence. Vital facts, however, may not be proved by unreasonable inferences or by inferences piled on inferences. Circumstantial evidence may by used to establish any material fact, but it must constitute more than mere suspicion or surmise.

**Evidence: Witnesses**
**Civil Procedure: Jury Trials: Province of Court & Jury**
When a jury is confronted with conflicting testimony, the appellate court cannot pass on the credibility of the witnesses nor substitute our findings for those of the jury, even though after reviewing the evidence the appellate court might have reached a different conclusion. It is the sole province of the trier of fact to judge the credibility and weight to be given to the testimony and to resolve any conflicts in the testimony of the witnesses.

Evidence: Witnesses
Civil Procedure: Jury Trials: Province of Court & Jury
A jury is free to make a reasonable inferential leap based on the evidence. A jury may believe all, part, or none of the testimony in arriving at the finding it concludes is the most reasonable.

Torts: Intentional Torts: Intentional Infliction of Emotional Distress
In evaluating the tort of intentional infliction of emotional distress, an appellate court must also focus on the nature of the defendant's conduct to determine if the strict requirements of the tort are satisfied.

Torts: Intentional Torts: Intentional Infliction of Emotional Distress
Behavior is not outrageous simply because it is tortious. Each case alleging intentional infliction of emotional distress must be decided on its own facts, as interpreted and weighed by the fact finder. Liability for intentional infliction of emotional distress may be imposed for making false statements when the falsity is serious and extreme and leads to severe emotional distress. Each case alleging intentional infliction of emotional distress must be decided on its own facts, as interpreted and weighed by the fact finder.

Torts: Intentional Torts: Intentional Infliction of Emotional Distress
Liability for intentional infliction of emotional distress may be imposed for making false statements when the falsity is serious and extreme and leads to severe emotional distress.

Torts: Intentional Torts: Intentional Infliction of Emotional Distress
Recovery for intentional infliction of emotional distress is permitted if a defendant acts recklessly, in deliberate disregard of a high degree of probability that emotional distress will follow.

Civil Procedure: Appeals: Standards of Review: Harmless & Invited Errors
Evidence: Procedural Considerations: Rulings on Evidence
For the exclusion of evidence to constitute reversible error, the complaining party must show: (1) that the trial court committed error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. The appellate court must review the entire record to determine whether error is harmful.

Evidence: Procedural Considerations: Burdens of Proof, Presumptions & Inferences
To recover damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for resulted from the conduct of the defendants.

Torts: Damages: Prejudgment Interest
Civil Procedure: Costs & Attorney Fees: Judgment Interest
Prejudgment interest in wrongful death and non-death personal injury cases begins to accrue six months after the occurrence of the incident giving rise to the cause of action.

Civil Procedure: Costs & Attorney Fees: Attorney Fees
In Texas, attorney's fees are recoverable only if a statute specifically provides for them or the parties expressly contract for them.

JUDGES: Panel consists of Justices Lee, Amidei, and Edelman.

OPINIONBY: NORMAN R. LEE

OPINION: OPINION

This appeal results from a judgment awarding damages for malicious prosecution, intentional infliction of emotional distress, and conspiracy. Appellee, Marion James Novark ("Novark"), a former deputy constable of Harris County Precinct 4, brought suit against appellants, who were his former superior, Constable Dick Moore ("Constable Moore"), and fellow deputies, Kenneth R. Schelsteder ("Schelsteder"), and Preston Ray Van Shoubrouek ("Van Shoubrouek"), (jointly referred to as "the deputies"), after he was acquitted of charges alleging he violated a prisoner's civil rights. The deputies bring sixteen points of error and Constable Moore raises ten points. We reverse and render in part and affirm as modified in part.

FACTS

On March 29, 1983, Van Shoubrouek and Schelsteder investigated[*2] a residential burglary. Schelsteder arrested William Scott Bossert ("Bossert") and transported him to the station, where he was handcuffed to a chair for questioning. Two unloaded weapons recovered from Bossert were on the table where Bossert was seated. During the questioning, Novark allegedly picked up one of the guns and pretended to put a bullet into the chamber. He was accused of pointing the gun at Bossert and pulling the trigger two or three times while ques-

tioning him about his involvement in several burglaries. The prisoner was visibly upset and began crying. Schelsteder then allegedly told Novark to put the gun down and Novark complied.

Deputy Steve Haines, reported the "Russian roulette" incident to his supervisor, Sergeant J.R. Jones. Constable Moore, the constable in charge of Harris County Precinct 4, was then notified about the incident. Constable Moore requested an investigation. As a result, Constable Moore was furnished with written statements from Schelsteder, Van Shoubrouek, and Haines, all of whom were present during Bossert's questioning. Schelsteder and Van Shoubrouek also prepared formal sworn statements with more detail.

While there are some differences[*3] in the deputies' statements, they generally reported that Novark pretended to load the gun, pointed it at Bossert and pulled the trigger two or three times. Only Van Shoubrouek stated that he saw Novark point the gun at Bossert. The other deputies reported hearing the sound of the gun's hammer striking and that Novark had the gun in his hand.

Based on these statements, Constable Moore decided to discharge Novark. Sergeant Jones, Novark's supervisor, told Novark he was fired on April 10, 1983. Novark's employment contract provided he was an at-will employee, subject to termination for any reason.

Novark's termination and details of the incident were reported in the media. A newspaper reporter contacted Constable Moore and questioned him about the incident. Constable Moore confirmed that Novark had been terminated and responded that he planned to continue the investigation and present his findings to the district attorney's office. He stated that Novark had a "clean record" in his office prior to this incident. The original article also quoted an unnamed "official close to the investigation" who supplied details of the incident, including an erroneous report that the gun was[*4] loaded during the Russian roulette incident. In a later news report, Constable Moore stated he no longer intended to take the case to the district attorney because the prisoner had not filed a complaint and Novark already had been punished by having his employment terminated. Constable Moore undertook no further investigation and no charges were pursued by the district attorney's office.

Shortly after reading a newspaper account of the incident on April 15, 1983, FBI Agent John Trethewey contacted Constable Moore and asked him for information about the incident. Constable Moore told him his of-

fice records were available to the FBI and had his office provide copies of the contents of his files to Trethewey. Trethewey attempted to interview Bossert, who was on probation for the burglary, but Bossert was unwilling to cooperate. Bossert told Trethewey he would talk to his attorney and get back to him if he decided to discuss the matter, but he never called Trethewey back. Trethewey closed his file. In 1984, Trethewey re-opened the case at the request of the U.S. Attorney's office. Trethewey took Bossert's statement in August 1984, during which Bossert indicated it was the arresting[*5] officer who pointed the gun at him. The physical description Bossert gave also more accurately described Schelsteder, who was reported to have had a moustache at the time of the incident. In December, Trethewey showed Bossert a photo spread of six deputy constables, all in uniform. The photographs were furnished by Constable Moore's office. Bossert identified Novark as the officer who pointed the gun, but also identified another officer who was not present the night of the incident. The photo of Novark supplied for the photo spread showed Novark with a moustache, even though he was clean shaven at the time of the incident. Bossert failed to identify either Schelsteder or Van Shoubrouek. Because of Bossert's apparent confusion, Trethewey again closed his file.

In 1985, Trethewey was again asked by Assistant U.S. Attorney Denise Ferguson-Southard to re-open his investigation. Ferguson-Southard contacted Constable Moore and told him that she wanted to prosecute Novark for violating Bossert's civil rights. Constable Moore responded that he thought it would be a mistake since it had been two years since the incident. Constable Moore also attended a meeting with Ferguson-Southard and[*6] Agent Trethewey.

On May 21, 1985, Novark was indicted by a federal grand jury for violating Bossert's civil rights. Assistant U.S. Attorney Ferguson-Southard prosecuted Novark's criminal trial in August 1985. Schelsteder and Van Shoubrouek were subpoenaed and testified before the grand jury and at trial, but Constable Moore did not testify in either proceeding. At trial, Bossert failed to identify Novark as the officer who had pointed the gun at him, but instead said that it was the arresting officer who played Russian roulette. Deputy Haines testified at trial and admitted that he had lied in his statement given to Constable Moore when he said he had not seen anything because he covered his eyes when he realized what was about to happen. He conceded that "most" of his statement was a lie. The jury returned a not guilty verdict.

Following his acquittal, Novark brought this suit against

appellants. n1 The jury rendered a verdict against Constable Moore, Van Shoubrouek and Schelsteder on Novark's claims for malicious prosecution and intentional infliction of emotional distress. The jury found in favor of Constable Moore on the conspiracy claims, but against Van Shoubrouek and[*7] Schelsteder. The jury found compensatory damages in the amount of $ 110,000, and awarded exemplary damages of $ 15,000 against Constable Moore and $ 5,000 against each of the deputies. The trial court entered judgment based on the verdict and additionally assessed attorney's fees in the amount of $ 151,104 against Van Shoubrouek and Schelsteder, based on the conspiracy verdict. This appeal resulted.

n1 Deputy Haines was never served and was dismissed from the suit. Other employees who were sued were not found liable and are therefore not parties to this appeal. Summary judgment was granted on Harris County's immunity defense.

## SANCTIONS

In their first two points, the deputies complain that the trial court erred in imposing sanctions against their attorney, Assistant County Attorney Barbara Burnett, for violation of the court's order on Novark's motion in limine. The court's order allowed mention of the details of the termination of Novark's employment with the Harris County Sheriff's Department[*8] and the Willis Police Department only as these matters affected the issue of damages.

Novark first complained that Burnett did not join in her client's notice of appeal and appeal bond or file a separate notice and bond, and therefore, this court had no jurisdiction to consider the propriety of an order imposing sanctions against the attorney personally. To invoke the jurisdiction of a court of appeals in civil cases, a cost bond, cash deposit, or affidavit of inability must be timely filed. Tex. R. App. P. 40(a) and 41(a). Defects in the bond, cash deposit in lieu of bond, or notice of appeal may be amended. See *City of San Antonio v. Rodriguez*, 828 S.W.2d 417, 418 (Tex. 1992) (wrong cause number); *Woods Expl. & Prod. Co. v. Arkla Equip. Co.*, 528 S.W.2d 568, 570 (Tex. 1975) (one appellant named instead of all three appellants); *El Paso Central Appraisal Dist. v. Montrose Partners*, 754 S.W.2d 797, 799 (Tex. App.--El Paso 1988, writ denied) (wrong party named as appellant). Following the Supreme Court's directive to permit amendments to de-

fective bonds, we allowed the bond in this case to be amended to show Barbara Burnett as a party to the appeal. See *Maxfield v. Terry*, 888 S.W.2d[*9] 809, 811 (Tex. 1994) (court of appeals should give appellant an opportunity to correct any defect in appeal bond before dismissing appeal). Now that our jurisdiction is properly established, we examine the merits of the attacks on the sanctions order against Burnett.

Originally, at the close of jury arguments on April 15, 1993, the court entered an order holding Burnett in contempt of court for violations of the court's order on Novark's motion in limine. The court ordered Burnett to perform 25 hours of community service to a charity of her choice. Burnett moved for reconsideration of the court's order and a hearing was held on May 14, 1993. At the conclusion of the hearing the court announced that she would withdraw the contempt order and issue an order of sanctions, changing the punishment imposed. The court ordered Burnett to perform no less than 25 hours of mentoring to women lawyers and deliver a one-hour lecture on motions in limine. An order incorporating the trial court's decision was not entered until August 25, 1993 ("the sanctions order").

The trial court entered its final judgment on the jury's verdict on May 10, 1993. Appellants timely filed a motion for new[*10] trial. As there is no order in our record overruling the motion, we assume it was overruled by operation of law seventy-five days after judgment. Tex. R. Civ. P. 329b(c), (e); *Clark & Co. v. Giles*, 639 S.W.2d 449, 450 (Tex. 1982). The court's plenary power extended another thirty days, or 105 days after entry of judgment. *Transamerican Leasing Co. v. Three Bears, Inc.*, 567 S.W.2d 799, 800 (Tex. 1978). Therefore, the court's plenary power expired on Monday, August 23, 1993, two days before the sanctions order was executed.

A court's jurisdiction to act must be legally invoked or its power to act is nonexistent and its acts are void. *State v. Olsen*, 360 S.W.2d 398, 399 (Tex. 1962) (orig. proceeding). Even a court's inherent judicial power does not confer jurisdiction where none exists. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 399 (Tex. 1979). A motion for sanctions does not survive the expiration of the trial court's plenary jurisdiction. *Jobe v. Lapidus*, 874 S.W.2d 764, 766 (Tex. App.--Dallas 1994, writ denied). A court has no power to order sanctions after its plenary power has expired. *Hjalmarson v. Langley*, 840 S.W.2d 153, 154-55 (Tex. App.--Waco 1992, orig. proceeding). [*11] A trial court has no more power to act in granting sanctions without jurisdiction than it does in any other matter. *Id. at 155*.

We decline to follow the contrary position advocated by the San Antonio Court of Appeals in *Wolma v. Gonzalez*, 822 S.W.2d 302 (Tex. App.--San Antonio 1991, orig. proceeding). While not directly on point, the discussion of sanctions imposed under rule 13 in Wolma is analogous to the attempted sanction order in this case. See Tex. R. Civ. P. 13. Relying primarily on federal law, the court in Wolma essentially held that a motion for rule 13 sanctions could be granted in a dismissed cause even though the court's plenary power had expired. *Id.* at 303. Wolma also relied upon two Texas cases, *Goad v. Goad*, 768 S.W.2d 356, 358 (Tex. App.--Texarkana 1989, writ denied), cert. denied, 493 U.S. 1021, 107 L. Ed. 2d 742, 110 S. Ct. 722 (1990), and *P.N.L., Inc. v. Owens*, 799 S.W.2d 439, 441 (Tex. App.--El Paso 1990, no writ), for the proposition that a trial court can impose a rule 13 sanction postjudgment. We agree with this general proposition. However, neither case stands for the proposition that a trial court can impose rule 13 sanctions after the expiration of its plenary jurisdiction. We find [*12]that the decisions in Jobe and Hjalmarson, also discussing rule 13 sanctions and holding that sanctions may not be issued outside the court's plenary power, are better reasoned.

The only postjudgment proceedings over which a trial court retains jurisdiction after the expiration of its plenary power are proceedings to clarify or enforce a judgment. *Allen v. Allen*, 717 S.W.2d 311, 312 (Tex. 1986) (per curiam). The sanctions order is characterized as an order nunc pro tunc. See Tex. R. Civ. P. 316. Clerical errors in the entry of a judgment previously rendered may be corrected by a judgment nunc pro tunc after the court's plenary power has expired. *Comet Aluminum Co. v. Dibrell*, 450 S.W.2d 56, 58 (Tex. 1970); *West Texas State Bank v. General Resources Mgmt. Corp.*, 723 S.W.2d 304, 306 (Tex. App.--Austin 1987, writ ref'd n.r.e.). A clerical error is a mistake or omission that prevented the judgment as entered from accurately reflecting the judgment that was rendered. *Universal Underwriters Ins. Co. v. Ferguson*, 471 S.W.2d 28, 29-30 (Tex. 1971). A judicial error occurs when the court considered the issue and made an erroneous decision. *Comet Aluminum*, 450 S.W.2d at 59. If a court attempts[*13] to correct a judicial error by signing a judgment nunc pro tunc after the expiration of its plenary power, the judgment is void. See *Dikeman v. Snell*, 490 S.W.2d 183, 186 (Tex. 1973).

Here, the trial court granted Burnett's motion for reconsideration in part, withdrew her previous order, and instituted different punishment. There is no question that the court did not merely correct a clerical error in the previous order, but instead re-evaluated her earlier decision and made a new and different ruling. The sanctions order is not a nunc pro tunc order.

We hold that the court's sanctions order is void because it issued after the trial court's plenary power had expired. Thus, there is no order withdrawing the original contempt order. The propriety of the court's order holding Burnett in contempt is not before this court, however. Moreover, it is well settled that contempt orders are not reviewable by appeal. *Ex parte Williams*, 690 S.W.2d 243, 243 n.1 (Tex. 1985); *Ex parte Cardwell*, 416 S.W.2d 382, 384 (Tex. 1967); *Metzger v. Sebek*, 892 S.W.2d 20, 54, (Tex. App.--Houston [1st Dist.] 1994, writ denied). The validity of a contempt order can be attacked only by a writ of habeas[*14] corpus, or in limited circumstances, by a writ of mandamus. *Rosser v. Squier*, 902 S.W.2d 962, 38 Tex. Sup. J. 988, 989 (June 29, 1995) (mandamus is appropriate when a fine is imposed and there is no physical restraint); *Williams*, 690 S.W.2d at 243 n.1 (validity of a contempt order can only be attacked collaterally by writ of habeas corpus).

We sustain the deputies' second point of error contending that the court exceeded its authority in ordering sanctions against Burnett.

## STANDARD OF REVIEW

The majority of appellants' complaints concern the legal and factual sufficiency of the evidence to support the jury's findings. There has been some confusion among the courts of appeals about the appropriate evidentiary standard in malicious prosecution cases. Because of the nature of malicious prosecution cases and the public policy need for citizens to feel free to furnish information relating to possible illegal activities to law enforcement authorities, it has been held that the proof must be "positive, clear and satisfactory." *Diamond Shamrock Corp. v. Ortiz*, 753 S.W.2d 238, 241 (Tex. App.--Corpus Christi 1988, writ denied). Here, the court instructed the jury to find the elements of[*15] malicious prosecution by clear and convincing evidence. The Supreme Court has since determined that the proper standard is the traditional burden of proof by a preponderance of the evidence. *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 793 (Tex. 1994). That burden does not change because trial judges are admonished to set aside the verdict and order a new trial if the evidence is not "positive, clear and satisfactory." Id.

It is well settled that courts of appeals have only two standards by which evidence is reviewed: factual sufficiency and legal sufficiency. *Meadows v. Green*, 524 S.W.2d

509, 510 (Tex. 1975). A court of appeals cannot apply a third standard of reviewing the evidence, the "clear and convincing" standard. Id. In Keever, the Supreme Court rejected any heightened standard of review of malicious prosecution verdicts in favor of the traditional standards of reviewing factual and legal sufficiency. *Keever, 888 S.W.2d at 795-96.*

In reviewing a "no evidence" point, we must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences. *Havner[*16] v. E-Z-Mart Stores, Inc., 825 S.W.2d 456, 458 (Tex. 1992); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).* If there is any evidence of probative force, that is, more than a scintilla of evidence, to support the finding, the point must be overruled. *Southern States Transp., Inc. v. State, 774 S.W.2d 639, 640 (Tex. 1989); Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987).* In considering the factual sufficiency of the evidence, we must consider and weigh all of the evidence and may set aside the verdict and remand the cause for a new trial if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).* When appellants challenge both the legal and factual sufficiency of the evidence supporting the jury's findings, we should first review the legal sufficiency challenges. *Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981).*

## CONSTABLE MOORE

Constable Moore has argued his appeal separately. In his points of error one, two, and four, he attacks the sufficiency of the evidence supporting the jury's [*17]finding that he maliciously prosecuted Novark. He also argues in point of error five that there is legally insufficient evidence to support the jury's finding of intentional infliction of emotional distress by Constable Moore. Moreover, because he claims there is no evidence of bad faith, Constable Moore argues in point ten that he is entitled to official immunity for performing quasi-judicial functions in the scope of his authority as an elected official.

## Malicious Prosecution

We first address the legal sufficiency of the evidence to support the jury's finding of malicious prosecution by Constable Moore in answer to Question No. 1. The instruction accompanying this question listed the elements

of malicious prosecution as follows:

1. A criminal prosecution was commenced against Mr. Novark;

2. The prosecution was caused by the defendants or by and through their aid and cooperation;

3. It terminated in favor of Mr. Novark;

4. Mr. Novark was innocent;

5. The defendants lacked probable cause to bring about the proceeding;

6. The defendants acted with malice;

7. Mr. Novark suffered damages as a result.

When the defendant makes a full[*18] and fair disclosure of the facts to a prosecuting officer and the officer decides to prosecute, the defendant acts with probable cause and is not liable for malicious prosecution. *Browning Ferris Indus., Inc. v. Zavaleta, 827 S.W.2d 336, 345 (Tex. App.--Corpus Christi 1991, writ denied); Thomas v. Cisneros, 596 S.W.2d 313, 317 (Tex. Civ. App.--Austin 1980, writ ref'd n.r.e.); Ada Oil Co. v. Dillaberry, 440 S.W.2d 902, 912 (Tex. Civ. App.--Houston [14th Dist.] 1969, writ dism'd).* The evidence in the record demonstrates that Constable Moore made a full and fair disclosure of the facts available to him to the federal authorities who then decided to seek Novark's indictment. Therefore, Constable Moore acted with probable cause and was not the cause of Novark's prosecution.

With respect to the jury's determination that Constable Moore maliciously prosecuted Novark, the only evidence favorable to the jury's finding is that Constable Moore made his files available to the FBI and Ferguson-Southard at their request. This evidence of merely "aiding or cooperating" with prosecuting officials in causing a criminal prosecution will not support a verdict of malicious prosecution. *Browning-Ferris[*19] Indus., Inc. v. Lieck, 881 S.W.2d 288, 292 (Tex. 1994).* A person does not procure a prosecution when the decision to prosecute is left to the discretion of another person, law enforcement official, or the grand jury. Id.

Even though he had originally considered it, Constable Moore did not pursue an indictment against Novark through the district attorney's office. Constable Moore did not initiate contact with the FBI or the U.S. Attorney's office. He did not request that charges be

brought against Novark. There is no evidence that Constable Moore encouraged or played any part in the decision to prosecute Novark. He did not testify before the grand jury or at the criminal trial. There is no evidence that Constable Moore had any knowledge about the incident beyond what was contained in the deputies' statements furnished to the investigating authorities. As to Novark's contention that Bossert was shown a suggestive photo spread, there is no evidence that Constable Moore chose the photos, that Moore knew that Bossert said the officer who pointed the gun had a moustache, or that Moore knew Novark was clean shaven. There was no evidence presented to show that Constable Moore knowingly[*20] provided false, incorrect, or misleading information or that he withheld material information within his possession. There is no evidence that Constable Moore did not believe the deputies. He had no duty to discuss the charges with Novark or investigate further before furnishing the reports to the federal authorities. See *Wal-Mart Stores, Inc. v. Medina, 814 S.W.2d 71, 72-74* (Tex. App.--Corpus Christi 1991, writ denied); *Marathon Oil Co. v. Salazar, 682 S.W.2d 624, 628* (Tex. App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.). We hold there is no evidence that Constable Moore, having made a full and fair disclosure, acted without probable cause.

Novark claimed that the appellants conspired to devise a plan to get rid of him in retaliation for actions he took that he believed Constable Moore opposed. First, Novark claimed the motivation behind this conspiracy was his investigation of a suspected prostitution operation. Novark was told to stop his investigation. Novark later admitted that an injunction had been filed against Precinct 4 prohibiting all officers from investigating these activities. Secondly, at his supervisor's instruction, Novark confiscated the honorary deputy's[*21] commission of one of Constable Moore's political supporters who was intoxicated in public. The supporter threatened Novark that this action would cost him his job. Novark's allegations concerning Constable Moore's motives are only speculative. Mere surmise or suspicion amounts to no more than a scintilla of evidence. *Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63* (Tex. 1983). In any event, Novark's contention that Constable Moore acted with malice is of no consequence in view of the fact that he acted with probable cause in furnishing the deputies' reports to the federal authorities. *Dominguez v. Kelly, 786 S.W.2d 749, 752* (Tex. App.--El Paso 1990, writ denied). While malice may be inferred from the lack of probable cause, lack of probable cause can never be inferred from proof of malice. *Salazar, 682 S.W.2d at 628.*

As noted earlier, the jury did not find that Constable Moore was part of a conspiracy, and Novark has raised no complaint on appeal about this failure to so find. Thus, the actions of the deputies which may support the elements of malicious prosecution are not imputed to Constable Moore. See *Akin v. Dahl, 661 S.W.2d 917, 921 (Tex. 1983),* cert. denied, *466 U.S. 938, 80 L. Ed. 2d 460, 104 S. Ct. 1911[*22] (1984).*

If the plaintiff fails to prove one or more of the elements of a cause of action for malicious prosecution, the claim fails as a matter of law. *Dominguez, 786 S.W.2d at 752.* Because Novark failed to show that Constable Moore acted without probable cause, we conclude that his claim of malicious prosecution by Constable Moore must fail as a matter of law. We sustain Constable Moore's points of error one, two, and four complaining of the legal sufficiency of the evidence to support the jury's finding of the elements of malicious prosecution.

Intentional Infliction of Emotional Distress

To support a claim of intentional infliction of emotional distress, the plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was "extreme and outrageous;" (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993); Tidelands Auto. Club v. Walters, 699 S.W.2d 939, 942* (Tex. App.--Beaumont 1985, writ ref'd n.r.e.). The conduct reaching the level of "outrageousness" necessary for liability for intentional infliction of emotional[*23] distress is described as being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wornick Co. v. Casas, 856 S.W.2d 732, 734 (Tex. 1993)* (citing Restatement (Second) of Torts 46 cmt. d (1965)).

As a matter of law, Constable Moore's actions in connection with Novark's investigation, discharge, and subsequent prosecution are not extreme and outrageous conduct. An employer act within his legal rights in investigating reasonably credible allegations of wrongdoing by his employees. *Randall's Food Markets, Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995).* As already discussed, Constable Moore merely gathered statements reporting wrongful conduct. He then passed that information on to the prosecuting authorities when they requested it of him, which was his only action connection with Novark's prosecution. There is no evidence beyond surmise or suspicion that Constable Moore acted with malice or in bad faith. Constable Moore exercised

his legal right to discharge Novark, an at-will employee. See *Casas, 856 S.W.2d at 735* (the fact of discharge alone of[*24] an at-will employee cannot give rise to a claim for intentional infliction of emotional distress).

We conclude that Constable Moore is not liable for intentional infliction of emotional distress as a matter of law. We sustain Constable Moore's fifth point of error complaining of the legal sufficiency of the evidence to support the jury's finding.

Official Immunity

Our decision as to Constable Moore need not rest on the lack of evidence alone. In his tenth point of error, Constable Moore argues that he acted in good faith as a matter of law and is therefore shielded from liability under the doctrine of qualified immunity. n2 We agree.

      n2 The terms "official immunity" and "qualified immunity" are used interchangeably. *Travis v. City of Mesquite, 830 S.W.2d 94, 100-01 n.2 (Tex. 1992)* (Cornyn, J., concurring).

Under the doctrine of official immunity, public officials whose actions may be classified as discretionary enjoy immunity from personal liability as long as they act with good faith[*25] within the scope of their authority. *City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994); Augustine by Augustine v. Nusom, 671 S.W.2d 112, 115 (Tex. App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.).* Immunity will only be extended to officials performing discretionary duties as opposed to those performing ministerial duties, which require obedience to orders or the performance of duties over which the actor has no choice. *Chambers, 883 S.W.2d at 654; Wyse v. Department of Public Safety, 733 S.W.2d 224, 227 (Tex. App.--Waco 1986, writ ref'd n.r.e.).* Discretionary actions, sometimes referred to as "quasi-judicial" actions, are actions requiring personal deliberation, decision and judgment. *Baker v. Story, 621 S.W.2d 639, 645 (Tex. App.--San Antonio 1981, writ ref'd n.r.e.).* When a state employee gathers facts and then acts on those facts, his actions are quasi-judicial in nature. *Austin v. Hale, 711 S.W.2d 64, 66 (Tex. App.--Waco 1986, no writ); Augustine, 671 S.W.2d at 115.*

The purpose of the doctrine of official immunity is to protect public officials from civil liability for conduct that would otherwise be actionable. *Chambers, 883 S.W.2d at 653-54.* The doctrine[*26] is based on

sound public policy which encourages public officers to perform their duties without fear of personal liability for negligent or improper performance. *Chapman v. Gonzales, 824 S.W.2d 685, 687 (Tex. App.--Houston [14th Dist.] 1992, writ denied).* An officer acts in good faith and is entitled to official immunity from liability if a reasonably prudent officer, under the same or similar circumstances, could have believed that his acts were justified. *Chambers, 883 S.W.2d at 656; City of Dallas v. Half Price Books, Records, Magazines, Inc., 883 S.W.2d 374, 377 (Tex. App.--Dallas 1994, no writ).*

The issue of official immunity in this case is similar to that in *Boozier v. Hambrick, 846 S.W.2d 593 (Tex. App.--Houston [1st Dist.] 1993, no writ).* In Boozier, the First Court of Appeals characterized a police officer's action in reporting misconduct to her supervisor as a discretionary act, and thus quasi-judicial. *Id. at 597.* Such an act clearly calls for the officer's "personal deliberation, decision, and judgment." Id. Here, Constable Moore's actions in investigating reported wrongful conduct by one of his employees and then furnishing those reports to federal authorities[*27] were discretionary and within the scope of his authority. After finding no fact issue was raised as to the officer's good faith in Boozier, the court held that she was entitled to judgment on her affirmative defense of official immunity as a matter of law. *Id. at 598.*

The record in this case also reveals no evidence disputing Constable Moore's good faith. Constable Moore obtained statements from the deputies and there is no evidence that he did not believe those statements. He merely cooperated with the FBI and U.S. Attorney's Office. To defeat Constable Moore's good faith defense, Novark had to show that no reasonable person in Constable Moore's position could have thought the facts were such that they justified Constable Moore's actions. See *Chambers, 883 S.W.2d at 657.* Novark failed in this proof; there is no evidence that Constable Moore's actions were unreasonable.

We hold that Constable Moore is entitled to official immunity as a matter of law and sustain his legal sufficiency challenge in point of error ten.

DEPUTIES   SCHELSTEDER   AND   VAN SHOUBROUEK

Apart from the two points of error concerning the sanctions order already discussed, the deputies bring[*28] fourteen additional points of error. They complain of charge error, the sufficiency of the evidence, exclusion of evidence, the award of attorney's fees and calculation

enforcement officer or prosecuting authority of information he believes to be true is not the cause of the prosecution and is not considered to have aided and cooperated in causing that prosecution, even if the information is false and a reasonable person would not believe it.

This instruction is based on language in the Restatement (Second) of Torts, cited with approval by many courts. n3 See, e.g., *Zavaleta, 827 S. W.2d at 346*. The issue of "full and fair disclosure" has been recognized as an element of proof in cases alleging malicious prosecution. The plaintiff has the burden to prove that the defendants failed to make a full and fair disclosure of the facts and circumstances known to them. *Zavaleta, 827 S. W.2d at 346.*

n3 The Restatement states in relevant part:

When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable . . . even though the information proves to be false and his belief was one that a reasonable man would not entertain.

Restatement (Second) of Torts, 653 cmt. g (1977).

[*33]

The Texas Supreme Court recently expressed its approval of full and fair disclosure as a protection to those accused of malicious prosecution in *Ellis County State Bank v. Keever, 888 S. W.2d 790, 794 (Tex. 1994)*. There, in rejecting the heightened burden of proof by clear and convincing evidence for claims of malicious prosecution, the court recognized that there are other safeguards available to assure reasonable protection to citizens who report criminal activity to prosecuting authorities. *Id. at 793-94.* First, this goal can be satisfied by demanding full satisfaction of all of the elements of the tort. *Id. at 793.* Moreover, those accused of malicious prosecution are rightly aided by "an initial presumption that a defendant acted reasonably in good faith and therefore had probable cause." *Id. at 794 (citing Akin v. Dahl, 661 S. W.2d at 920)*. The court further asserted that "protection is also afforded to one who makes a full and fair disclosure to the prosecuting attorney." Id. (citing *Zavaleta, 827 S. W.2d at 345; Cisneros, 596 S. W.2d at 317; Dillaberry, 440 S. W.2d at 912)*. The court did not, however, address the issue of whether an instruction is required.

The elements[*34] of the tort of malicious prosecution included in the charge to the jury in this case generally comport with the law, with one major exception recently clarified by our Supreme Court in *Browning-Ferris Indus., Inc. v. Lieck, 881 S. W.2d 288, 291-93 (Tex. 1994)*. In Lieck, the court rejected the statement of the causation element of malicious prosecution as "cause, or aid or cooperate in causing," cited by many courts, and used in the instructions in this case. *Id. at 292.* Instead, the court enunciated the proper standard of causation as whether the defendant "procured or initiated" the criminal proceedings. *Id. at 293.* "Initiated" does not ordinarily need to be defined because it is demonstrated by evidence that the defendant actually filed formal charges against the plaintiff, but "procurement" is defined as follows:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides[*35] information which he knows is false. A criminal prosecution may be procured by more than one person.

Id. Thus, we conclude that an instruction on full and fair disclosure is necessary to aid the jury in answering a question on malicious prosecution when causation is submitted as it was in this case.

Novark argues that appellants waived their entitlement to an instruction on this issue by failing to plead full and fair disclosure as an affirmative defense. An affirmative defense permits a party to introduce evidence to establish an independent reason why its opponent should not prevail, not to rebut the factual proposition of its opponent's pleadings. *Gorman v. Life Ins. Co. of North America, 811 S. W.2d 542, 546 (Tex.), cert. denied, 502 U.S. 824, 116 L. Ed. 2d 60, 112 S. Ct. 88 (1991)*. An affirmative defense is one of avoidance, rather than a defense in denial. Id. We agree with the deputies' contention that full and fair disclosure is not an affirmative defense. Instead, the plaintiff must negate full and fair disclosure as part of his proof of the elements of the tort. *Zavaleta, 827 S. W.2d at 346; Coniglio v. Snyder, 756 S. W.2d 743, 747 (Tex. App.--Corpus Christi 1986, writ denied)*.

Novark also[*36] argues that this instruction is subsumed within the approved definitions of malice and probable cause submitted to the jury and would be re-

dundant. A prosecuting party acts with probable cause where, in good faith, he makes a full and fair disclosure of the facts and circumstances known to him at the time. *Coniglio, 756 S.W.2d at 744; Salazar, 682 S.W.2d at 627.* Had similar language been included in the court's charge on probable cause, we would agree with Novark's contention that full and fair disclosure is subsumed in probable cause.

Instead, the charge instructed that "probable cause" means:

the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within one's knowledge that the person charged was guilty of the crime for which he was prosecuted.

This definition was expressly approved by the Texas Supreme Court in *Akin v. Dahl, 661 S.W.2d at 921.* This same definition of probable cause was used in Zavaleta. There, the Corpus Christi court found that "full and fair disclosure" was not included in the definition of "probable cause." *Zavaleta, 827 S.W.2d at 346.* The court reversed, holding that the definition of[*37] probable cause was insufficient and therefore erroneous by failing to instruct on full and fair disclosure. *Id.*

In Akin and the line of cases following it, the defendant actually brought the formal complaint. In this case, the defendants did not formally bring a criminal complaint, but instead furnished information to the federal authorities who used their own discretion in seeking Novark's indictment. In Zavaleta, the Corpus Christi court relied on a line of cases where the indictment was caused indirectly through the aid or cooperation of the defendant. These cases have held that under those circumstances, the defendant is not liable if he has made a full and fair disclosure of the facts to the prosecuting authorities. *Zavaleta, 827 S.W.2d at 345* (citing *Coniglio, 756 S.W.2d at 744; Salazar, 682 S.W.2d at 627;* and *Cisneros, 596 S.W.2d at 317).*

The trial court defined "malice" in this case as follows:

A party acts with malice if he is actuated by wrongful motive in the institution and/or continuance of a prosecution. Wrongful motive, coupled with a wrongful act willfully done to the injury of another, constitutes legal malice.

This definition focuses on the actor's[*38] motives instead of the nature of the disclosure made. Thus, full and fair disclosure is not subsumed in the definition of malice given to the jury in this case.

Finally, Novark argues the deputies did not make full and fair disclosure because they gave false statements. Thus, he contends the evidence does not support their entitlement to this instruction. We disagree. Discrepancies in the details of the deputies' statements do not establish that they are false as a matter of law. Failure to include an allegation that Schelsteder struck Bossert, the prisoner in custody, does not demonstrate lack of full disclosure as a matter of law because the deputies denied that incident occurred. In addition, Bossert may have been unable to identify who pointed the gun at him due to his intoxication at the time of the incident, or simply due to the passage of time. Reasonable minds could differ as to the truth of the deputies' statements. There is some evidence in the record to support submission of an instruction on full and fair disclosure. Defendants, as well as plaintiffs, are entitled to an affirmative submission of each theory supported by the evidence. *Ahlschlager v. Remington Arms Co., [*39] 750 S.W.2d 832, 835* (Tex. App.--Houston [14th Dist.] 1988, writ denied).

We hold that the trial court erred in refusing appellants' requested instruction on full and fair disclosure. When we review the charge as a whole, this error is compounded by the court's instruction on the causation element. By including the now rejected instruction on "aid or cooperate" in causing a prosecution, the court's failure to add an instruction on full and fair disclosure could have led the jury to find against appellants for merely furnishing information to the federal authorities. n4 The instructions on malice and probable cause do not completely alleviate this problem. We conclude that the error in the court's charge probably led to the rendition of an improper verdict on malicious prosecution. Tex. R. App. P. 81(b)(1). We sustain the deputies' fifth point of error.

n4 As it is not before this court, we do not reach the issue of whether an instruction on full and fair disclosure would be required when the jury is properly instructed on the causation element of "initiated or procured," as now required by the Texas Supreme Court. We note that in the court's recommended instruction, a person can "procure" a prosecution if he "provides information which he knows is false." *Lieck, 881 S.W.2d at 293.*

[*40]

Novark also received favorable findings on conspiracy and intentional infliction of emotional distress, however.

When the jury returns favorable findings on alternative theories, the prevailing party is entitled to seek recovery under an alternative theory if the judgment based on one theory is reversed on appeal. *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988).* The fact that Novark's malicious prosecution theory was erroneously submitted does not preclude his other claims if supported by the evidence. See *Hughes v. Houston Northwest Medical Center, Inc., 680 S.W.2d 838, 841-42 (Tex. App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.).* Therefore, we must consider whether liability may be supported under any theory submitted to the jury. See *Transport Ins. Co. v. Faircloth, 898 S.W.2d 269, 274 (Tex. 1995).*

Sufficiency of the Evidence

1. Conspiracy

In their seventh point of error, the deputies contest the sufficiency of the evidence to support the jury's finding of conspiracy. The deputies claim they cannot be liable for conspiracy because they are protected by the "intracorporate conspiracy" defense. The general[*41] rule is that a corporation cannot conspire with its employees because the acts of a corporation's agents are deemed to be the acts of the corporation itself. *Fojtik v. First Nat'l Bank of Beeville, 752 S.W.2d 669, 673 (Tex. App.--Corpus Christi 1988), writ denied per curiam, 775 S.W.2d 632 (Tex. 1989);* see also *Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 914 (5th Cir. 1952), cert. denied, 345 U.S. 925, 97 L. Ed. 1356, 73 S. Ct. 783 (1953).* The deputies argue that as deputies of the Harris County Precinct 4 Constable's office, they are agents of a single governmental entity and their actions are those of that entity.

We find the intracorporate conspiracy exception inapplicable under these facts. Here, the deputies were also sued in their individual capacities. Therefore, the suit alleged "two or more persons" conspired against *Novark. Nelson v. Fontenot, 784 F.Supp. 1258, 1261 (E.D. Tex. 1992);* see also *Dussouy v. Gulf Coast Inv. Corp, 660 F.2d 594, 603 (5th Cir. 1981)* (recognizing an exception to intracorporate conspiracy defense when officers act for their own personal purposes).

We next address Novark's assertion that the evidence supports a finding of a conspiracy to interfere with[*42] civil rights under The Ku Klux Klan Act, *42 U.S.C. 1985* (1994). While Novark pled a cause of action under the federal statute, he failed to specify which subpart of the Act appellants allegedly violated, and we cannot discern which, if any, part of the Act is applicable to these facts.

Moreover, Novark failed to submit a violation of the federal statute to the jury.

In Question No. 2, the jury in this case was asked whether each of the defendants "did conspire to wrongfully or falsely accuse Mr. Novark of violating an individual's civil rights?" This question was accompanied by numerous instructions and definitions, including the elements of common law civil conspiracy. These essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result of these acts. *Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983).* Nowhere was the jury instructed as to the elements of a violation of the federal statute. We conclude that any allegations of federal conspiracy under the Ku Klux Klan Act are waived by failure[*43] to submit the issue to the jury. See *Cosgrove v. Grimes, 774 S.W.2d 662, 666 (Tex. 1989)* (failure to submit properly worded question for inclusion in the charge waives ground of recovery). Therefore, we address only common law conspiracy in this opinion.

In our review of the jury's finding on the conspiracy claim, the evidence must show a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act that results in the injury; there must be a preconceived plan and unity of design and purpose. *Ward v. Sinclair, 804 S.W.2d 929, 931 (Tex. App.--Dallas 1990, writ denied).* Proof of conspiracy may be, and usually must be, made by circumstantial evidence. *Carr v. Hunt, 651 S.W.2d 875, 882 (Tex. App.--Dallas 1983, writ ref'd n.r.e.).* Vital facts, however, may not be proved by unreasonable inferences or by inferences piled on inferences. Id. Circumstantial evidence may by used to establish any material fact, but it must constitute more than mere suspicion or surmise. *Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993).*

In this case, there is conflicting testimony as to whether the deputies falsely accused[*44] Novark of violating a prisoner's civil rights. When the jury is confronted with conflicting testimony, we cannot pass on the credibility of the witnesses nor substitute our findings for those of the jury, even though after reviewing the evidence we might have reached a different conclusion. *Herbert v. Herbert, 754 S.W.2d 141, 145 (Tex. 1988); Precision Homes, Inc. v. Cooper, 671 S.W.2d 924, 929 (Tex. App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.).* It is the sole province of the trier of fact to judge the credibility and weight to be given to the testimony

and to resolve any conflicts in the testimony of the witnesses. *Precision Homes, 671 S.W.2d at 929.* Based upon the jury's answers as to the liability questions, it is apparent that the jury resolved these conflicts in favor of Novark's version of events and disbelieved the deputies' version. The jury's conclusion favoring Novark's testimony is supported by evidence that Bossert did not identify Novark as the officer who pointed the gun at him, but instead contended it was the arresting officer. In addition, the deputies' testimony at trial differed from earlier testimony, and they were impeached numerous times with inconsistent[*45] previous testimony from their depositions, before the grand jury, and at Novark's criminal trial.

Novark contends that an inference supporting the "meeting of the minds" element in this case could be drawn from the similarity in the essential details of the incident as reported in the deputies' statements. This similarity could have led the jury to conclude that the deputies acted together to falsely accuse Novark. In the jury's view, this inference could serve as a logical explanation for two people independently to recount the same false version of events. The jury is free to make a reasonable inferential leap based on the evidence. *Walters v. American States Ins. Co., 654 S.W.2d 423, 426 (Tex. 1983).* The jury may believe all, part, or none of the testimony in arriving at the finding it concludes is the most reasonable. *Fichtner v. Richardson, 708 S.W.2d 479, 483* (Tex. App.--Dallas 1986, writ ref'd n.r.e.). Based on the jury's credibility determination that the deputies made false reports in their statements, it is reasonable to infer that the deputies collaborated to falsely accuse Novark of violating a prisoner's civil rights. This conclusion, which is supported by the evidence, [*46] constitutes more than mere suspicion and is not outweighed by contrary evidence. We hold there is legally and factually sufficient evidence to support the jury's finding of conspiracy. We overrule the deputies' seventh point of error.

### 2. Intentional Infliction of Emotional Distress

In their ninth point of error, the deputies contest the sufficiency of the evidence to support the jury's finding on intentional infliction of emotional distress. The jury was properly instructed on the elements of this tort as set forth in *Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993).* Based on the evidence and its assessment of the credibility of the witnesses, the jury found that the deputies intentionally or recklessly, through their extreme and outrageous conduct, inflicted severe emotional distress on Novark.

We do not question whether the distress caused by a federal criminal indictment, trial, and the threat of imprisonment may be severe enough to support liability. Novark testified that at the time he learned of the federal indictment, his high blood pressure was aggravated and he was hospitalized for three days for hypertension, it was very traumatic to be unable to find[*47] employment while the trial was pending, he could not sleep or concentrate on projects, and friends and family "turned their backs" on him.

In evaluating the tort of intentional infliction of emotional distress, however, we must also focus on the nature of the defendants' conduct to determine if the strict requirements of the tort are satisfied. *Twyman, 855 S.W.2d at 622* ("the rigorous legal standards of the Restatement formulation of intentional infliction of emotional distress help assure a meaningful delineation between inadvertence and intentionally or recklessly outrageous misconduct"). As we noted earlier, liability should be found only where "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id. at 621* (quoting Restatement (Second) 46 cmt. d). See, e.g, *Twyman, 855 S.W.2d at 620 n.1* (husband coerced his wife to engage in sadomasochistic bondage activities, knowing she feared such activities because she had been raped at knife-point before marriage).

Behavior is not outrageous simply because it is tortious. *Natividad[*48] v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994).* See, e.g., *Diamond Shamrock Refining and Marketing Co. v. Mendez, 844 S.W.2d 198, 202 (Tex. 1992)* (while employer's conduct in allegedly depicting discharged employee in the community as a thief was not sufficiently outrageous to support a claim of intentional infliction of emotional distress, false light invasion of privacy was not precluded); *Carr v. Mobile Video Tapes, Inc., 893 S.W.2d 613, 620-21* (Tex. App.--Corpus Christi 1994, no writ) (humane society investigator's conduct in filing complaint for cruelty to animals which was later dismissed was not outrageous for purposes of intentional infliction of emotional distress claim, but claims of defamation, invasion of privacy and trespass were viable).

Each case alleging intentional infliction of emotional distress must be decided on its own facts, as interpreted and weighed by the fact finder. *LaCoure v. LaCoure, 820 S.W.2d 228, 233* (Tex. App.--El Paso 1991, writ denied); see also *Motsenbocker v. Potts, 863 S.W.2d 126, 133-34* (Tex. App.--Dallas 1993, no writ)

(upholding jury verdict awarding damages for intentional infliction of emotional distress based on business owner's[*49] outrageous conduct in modifying former owner/consultant's health insurance, raising deductible from $ 300 to $ 50,000, knowing plaintiff was undergoing treatment for terminal cancer).

In this case, the jury discounted the deputies' version of events, effectively determining that they made false reports about Novark. Liability for intentional infliction of emotional distress may be imposed for making false statements when the falsity is serious and extreme and leads to severe emotional distress. See Restatement (Second) of Torts 46 cmt. d, illus. 1 (1965) (liability may be imposed where A falsely tells B that her husband has been badly injured in an accident and is in the hospital, causing B to suffer severe emotional distress).

The Restatement permits recovery for intentional infliction of emotional distress if a defendant acts recklessly, in deliberate disregard of a high degree of probability that emotional distress will follow. Restatement (Second) 46 cmt. i. It is very probable that serious consequences will result when a law enforcement officer accuses another officer of violating a prisoner's civil rights. Here, the deputies' actions in accusing Novark of playing Russian [*50]roulette with a prisoner during interrogation led to Novark's criminal indictment and trial. The deputies recklessly disregarded the risk that Novark would suffer severe emotional harm from their accusation. We conclude that the deputies' conduct in making a false allegation of serious misconduct, as found by the jury, constitutes outrageous conduct under the facts presented here. The only contrary evidence of any probative value was the deputies' testimony, which the jury was free to disbelieve.

We hold that the jury's finding of intentional infliction of emotional distress by the deputies is supported by both legally and factually sufficient evidence. We overrule their ninth point of error.

Exclusion of Evidence

In point of error thirteen, the deputies complain that the trial court erroneously and harmfully excluded evidence of Novark's work-related misconduct. They contend this evidence is necessary to assess Novark's entitlement to lost earnings and employments benefits. Specifically the deputies complain of the trial court's exclusion of the following exhibits incorporated in their bill of exceptions:

1. a written warning issued to Novark on April 8, [*51]

1982 by his supervisor at Precinct 4 documenting an incident of insubordination for failure to follow the appropriate chain of command (DX-3);

2. a memorandum documenting Novark's termination from the Harris County Sheriff's Department of December 31, 1980 (DX-8); and

3. a statement from Herschell McWalters to Don Lacy of the Willis Police Department dated August 26, 1984, relating McWalters' beating by two Willis police officers while he was in their custody (DX-10).

For the exclusion of evidence to constitute reversible error, the complaining party must show: (1) that the trial court committed error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. McCraw v. Maris, 828 S.W.2d 756, 757 (Tex. 1992); Tex. R. App. P. 81(b)(1). We must review the entire record to determine whether error is harmful. Gee v. Liberty Mut. Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989).

The trial court excluded DX-3, the written warning, as improper character evidence. Specific acts of misconduct are inadmissible to show a party acted in conformity with those acts. Tex. R. Civ. Evid. 404(b). The deputies contend on appeal that[*52] the exhibit was offered to negate Novark's entitlement to lost wages, but at trial their counsel argued that the exhibit "shows what type of individual we are dealing with." The reasons presented to the appellate court for review must coincide with the reasons presented to the trial court for admitting or excluding evidence. Rhodes v. Batilla, 848 S.W.2d 833, 847 (Tex. App.--Houston [14th Dist.] 1993, writ denied). We therefore reject the deputies' complaint as to the exclusion of DX-3.

The trial court properly sustained Novark's hearsay objection to DX-8, an unauthenticated record from Novark's previous employer. See Tex. R. Civ. Evid. 902(10). Moreover, the fact that Novark was terminated by Harris County was referred to several times during trial, clearly eliminating any harm from the exclusion of DX-8.

The deputies contend that the incident reported in DX-10 led to Novark's termination from the Willis Police Department. McWalters' statement, however, does not identify the two officers who beat him. In any event, we are unable to review the deputies' complaint as to the exclusion of this statement because they failed to identify where in the record this exhibit was offered[*53] and objection was made. See Tex. R. App. P. 74(d).

1995 Tex. App. LEXIS 2374, *53

We find only that the trial court permitted the exhibit to be included in the defendants' bill of exceptions without explanation. The deputies waived any error in the exclusion of DX-10. See Tex. R. App. P. 52(a),(b).

We overrule the deputies' thirteenth point of error.

Damages, Attorney's Fees, and Interest

In their points of error ten, eleven, and twelve, and the deputies attack the sufficiency of the evidence establishing that Novark lost wages and employment benefits as a result of their actions. n5 The jury found in Question No. Five, which was conditioned on an affirmative finding on any of the causes of action submitted, that Novark was entitled to $ 60,000 in damages for "loss of pay" and $ 10,000 for "loss of employment benefits."

n5 The deputies do not complain about the damages awarded for emotional distress, damage to reputation, or punitive damages.

The deputies argue that because this is not a wrongful discharge case, no [*54]damages stem from Novark's loss of employment with Precinct 4. The deputies did not object, however, to the submission of lost wages and benefits as elements of damages. They also did not request that separate damages questions be submitted as to each of Novark's claims. Because they did not object, the deputies waived any argument that the damages elements did not relate to the asserted grounds of recovery. Tex. R. Civ. P. 274; See *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 368 *(Tex. 1987); Wilgus v. Bond*, 730 S.W.2d 670, 672 *(Tex. 1987).*

To recover damages, a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for resulted from the conduct of the defendants. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 209 *(Tex. 1985).* Our review of the evidence supporting the jury's finding that the deputies' actions caused Novark's damages reveals the following: Novark testified that his termination following the deputies' allegations, along with the newspaper and television reports, caused him to lose wages; he stated that he tried unsuccessfully to find a job through two different employment agencies and made twelve[*55] to fifteen applications for jobs; he explained that he was always rejected for these jobs and was told that he would not be hired because of the allegations leading to the termination of his employment with Constable Moore's

office; the only employment in law enforcement Novark was able to obtain were unpaid reserve positions undertaken to maintain his commission; Novark testified as to the amount of salary and benefits he could have reasonably expected to receive had he remained employed; Constable Moore testified as to the salaries of deputy constables and how much Novark would have earned at time of trial if he were still employed; and Novark furnished his income tax returns showing his actual earnings between 1981-91. In view of this evidence, the deputies' legal sufficiency challenge must fail.

Reviewing the contrary evidence, we note that Novark admitted he was terminated by the Willis Police Department for violating a prisoner's civil rights. Novark had also been terminated by the Harris County Sheriff's Department. Novark acknowledged that he was an at-will employee of Precinct 4 and could be fired at any time without cause. This evidence is not so overwhelming as to render [*56]the jury's verdict unjust.

We conclude that the jury could have reasonably inferred that the deputies' accusations caused Novark's damages in that he was unable to obtain gainful employment in law enforcement in the face of allegations of violating a prisoner's civil rights. There is legally and factually sufficient evidence to support the jury's findings that the deputies' actions caused Novark to lose wages and employment benefits. We overrule the deputies' points of error ten, eleven and twelve.

In point of error fourteen, the deputies contend that the trial court erred in awarding prejudgment interest accruing from October 8, 1983, 180 days after Novark's termination. They argue, without proposing a different accrual date, that prejudgment interest should be linked instead to the federal criminal charges.

Because this suit was commenced in August 1986, prejudgment interest is governed by the principles set forth in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 *(Tex. 1985).* n6 In Cavnar, the Texas Supreme Court held that prejudgment interest in wrongful death and non-death personal injury cases begins to accrue six months after "the occurrence of the incident[*57] giving rise to the cause of action." *Id. at 555.* The express reason given for setting this method of calculation was to fairly compensate the plaintiff while avoiding the difficulty in determining exactly when a plaintiff sustains each element of damages. Id.

n6 The current law governing prejudgment interest

states in relevant part:

Prejudgment interest accrues on the amount of the judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the ay the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered.

Tex. Rev. Civ. Stat. Ann. art. 5069-1.05 6(a) (Vernon Supp. 1995). This statute applies to actions commenced on or after its effective date, September 2, 1987. Act of Sept. 2, 1987, 70th Leg., 1st C.S., ch. 3, 3(a)(1), 1987 Tex. Gen. Laws 51, 52.

In this case, the incident given rise to Novark's causes of action is the deputies' making statements, determined by the jury to be false, accusing [*58]Novark of violating a prisoner's civil rights. Even though the criminal prosecution did not occur until two years later, we conclude that the allegations made by the deputies "gave rise" to Novark's damages. The formal, sworn statements of the deputies were made on April 4, 1983. Therefore, prejudgment interest should properly begin to accrue six months later, in October 1983. n7 We overrule the deputies' fourteenth point of error.

n7 Novark does not complain about prejudgment interest accruing from October 8, instead of October 4, 1983.

In point of error fifteen, the deputies argue that the trial court erred in awarding attorney's fees. We agree. In Texas, attorney's fees are recoverable only if a statute specifically provides for them or the parties expressly contract for them. *New Amsterdam Cas. Co. v. Texas Indus., Inc., 414 S.W.2d 914, 915 (Tex. 1967)*. We have already determined that Novark failed to submit the federal conspiracy claim that could have entitled him to statutory attorney's fees. See *42[*59] U.S.C. 1988*(b) (1994) (permitting recovery of attorney's fees in certain federal civil rights actions). There is no other statutory provision or agreement between the parties providing for attorney's fees for Novark's common law tort claims. Therefor, attorney's fees are not available for these claims. We sustain the deputies fifteenth point of error.

## CONCLUSION

The trial court's order of sanctions against Barbara Burnett is void. We reverse and render judgment that Novark take nothing from Constable Moore. Even though we find charge error occurred in the submission of Novark's malicious prosecution claim, Novark's alternative theories support the judgment against the deputies. We modify the judgment against Deputies Schelsteder and Van Shoubrouek to delete the award of attorney's fees. In all other respects, the judgment against the deputies is affirmed.

/s/ Norman R. Lee

Justice

Judgment rendered and Opinion filed September 28, 1995.

Panel consists of Justices Lee, Amidei, and Edelman.